SACK BROTHERS, A NEBRASKA GENERAL PARTNERSHIP, APPELLANT, V. TRI-VALLEY COOPERATIVE, INC., A NEBRASKA CORPORATION, APPELLEE.

616 N.W. 2d 786

Filed September 1, 2000.    No. S-99-354.

W. Craig Howell and James F. Cann, of Domina Law, P.C., for appellant.

Rocky C. Weber, of Crosby, Guenzel, Davis, Kessner, and Kuester, for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, McCORMACK, and MILLER-LERMAN, JJ.

WRIGHT, J.

## NATURE OF CASE

Sack Brothers filed a declaratory judgment action against Tri-Valley Cooperative, Inc. (Tri-Valley), seeking to have certain contracts entered into between the parties declared void and unenforceable. Tri-Valley counterclaimed, alleging that Sack Brothers had breached the contracts. The trial court granted Tri-Valley's motion for summary judgment and subsequently awarded damages in favor of Tri-Valley. Sack Brothers appeals.

## SCOPE OF REVIEW

In reviewing a summary judgment, an appellate court views the evidence in a light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Gering - Ft. Laramie Irr. Dist. v. Baker*, 259 Neb. 840, 612 N.W.2d 897 (2000).

■ Whether a document is ambiguous is a question of law, and an appellate court considering such a question is obligated to reach a conclusion independent of the trial court's decision. *Callahan v. Washington Nat. Ins. Co.*, 259 Neb. 145, 608 N.W.2d 592 (2000).

## FACTS

Tri-Valley is a farmer-owned cooperative that maintains offices in several Nebraska towns. It is in the business of buying and reselling grain.

Sack Brothers is a Nebraska partnership engaged in farming. At all relevant times, it farmed approximately 3,600 acres of ground. At some point, Sack Brothers hired Competitive Strategies for Agriculture of Nebraska (CSA), a grain marketing consultant business, to negotiate its contracts with Tri-Valley and to act as its agent. Sack Brothers entered into four hedge-to-arrive (HTA) contracts with Tri-Valley in August and October 1995. Three of these contracts were subsequently amended in order to change the delivery date and the destination for delivery.

Each of the contracts contained the following relevant terms:

SELLER warrants that the commodity represented under this contract are, will be, or are able to be in their possession and are therefore capable of being tangibly exchanged.

SELLER states an understanding of cash basis. Cash Basis is the difference between the price of the futures contract and the cash bid posted by the BUYER, for the delivery period of this contract, at the time the SELLER elects to set the "CASH BASIS". SELLER understands that at this time the CASH BASIS has not been determined in establishing the CASH PRICE of said grain on arrival.

SELLER agrees to set the Cash Basis and determine the CASH PRICE of said grain on or before the first physical delivery of said grain, or by the first notice day for the futures position, whichever comes first. If SELLER has not set the basis according to the terms stated above, BUYER is authorized to set the CASH BASIS and CASH PRICE of this contract. SELLER further understands that the BUYER is not obligated to give prior notice.

BUYER is responsible for commissions and margin requirements of this transaction. SELLER agrees that the transaction shall be subject to the rules of the Chicago Board of Trade and the marketing policies of the BUYER.

Upon physical delivery of the said grain the BUYER has the right of first refusal. The BUYER also has the right to request the proceeds of the said grain be made payable to the BUYER and SELLER. The SELLER will then have the proceeds sent to the BUYER for reissuance of the proceeds with any losses on the futures position and service fees reduced from the proceeds. In this instance final payment of the said grain will hereby come from the BUYER.

A service fee of 4 (four) cents per bushel will be assessed against the CASH PRICE of this contract upon final settlement. An additional service fee of 2 (two) cents per bushel will be assessed for each time the futures option month of the Hedge to Arrive is changed or rolled. If the said grain for this contract is physically delivered to the BUYERS elevator the BUYER agrees to rebate 2 (two) cents per bushel to the SELLER.

SELLER agrees that he is financially responsible to the BUYER in the case of non-delivery of grain covered in this contract. It is further agreed by and between the BUYER and SELLER that this contract shall be binding upon the heirs, administrators, executors and successors of the respective parties and that this contract cannot be assigned.

In addition, the contracts set forth the grade and type of grain, the arrival period, the quantity, the futures option, and the futures option price. If a contract was amended by agreement of the parties, the price of the commodity was adjusted according to the contract.

In January 1996, Tri-Valley learned that many of CSA's clients, including Sack Brothers, had sold large volumes of grain to other elevators. Tri-Valley requested that CSA prepare and mail a memorandum of understanding to the producers confirming their understanding of the risk of rolling a contract forward in an inverted market. Thereafter, Sack Brothers sought declaratory relief in the district court for Howard County, alleging that

the HTA contracts were unenforceable and without legal effect. Tri-Valley counterclaimed, asserting that Sack Brothers had breached its contracts.

Both parties moved for summary judgment. Sack Brothers alleged that it was entitled to summary judgment because the contracts were void and unenforceable as a matter of law. Tri-Valley alleged that the contracts were exempt from and did not violate the Commodity Exchange Act, 7 U.S.C. § 1 et seq. (1994 & Supp. IV 1998); Nebraska's Commodity Code, Neb. Rev. Stat. § 8-1701 et seq. (Reissue 1997); the Securities Act of Nebraska; the Securities Act of 1933; or the Securities Exchange Act of 1934.

The trial court concluded that the contracts were "forward contracts" excluded from the Commodity Exchange Act and Nebraska's Commodity Code and were not investment contracts sold in violation of Nebraska's "Blue Sky" laws, the Securities Act of Nebraska, the Securities Act of 1933, or the Securities Exchange Act of 1934. The court found that the contracts were between a seller engaged in the business of producing grain and a buyer engaged in the business of buying grain. The court determined that the contracts were written in clear and unambiguous language and that the parol evidence rule prevented the admission of contemporaneous oral agreements or negotiations which contradicted or varied the terms of the contracts. The court concluded that Sack Brothers' evidence as to " 'no delivery contemplated' " and " 'unlimited rolls of the contracts' " fell clearly within the parol evidence rule and was therefore inadmissible. The court further found that Sack Brothers had failed to deliver the grain to Tri-Valley as required and had anticipatorily breached the contracts.

The trial court granted summary judgment in favor of Tri-Valley and subsequently awarded damages in the amount of $288,450. Costs were taxed to Sack Brothers, and the judgment was to draw interest at the rate of 5.584 percent from February 24, 1999.

## ASSIGNMENTS OF ERROR

Sack Brothers claims that the trial court erred in denying its motion for summary judgment, in granting Tri-Valley's motions

for summary judgment on liability and damages, and in disregarding material evidence pursuant to the parol evidence rule.

## ANALYSIS

In their respective motions for summary judgment, Sack Brothers and Tri-Valley each contended that there were no material issues of fact in dispute and that they were entitled to judgment as a matter of law. In reviewing a summary judgment, an appellate court views the evidence in a light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Gering - Ft. Laramie Irr. Dist. v. Baker*, 259 Neb. 840, 612 N.W.2d 897 (2000).

In conjunction with its argument that the trial court erred in granting summary judgment in favor of Tri-Valley, Sack Brothers asserts that the court erred in disregarding certain evidence based on the parol evidence rule. We will first consider whether the court erred in refusing to admit parol evidence offered by Sack Brothers regarding the contracts.

The parol evidence rule renders ineffective proof of a prior or contemporaneous oral agreement which alters, varies, or contradicts the terms of a written agreement. *Five Points Bank v. White*, 231 Neb. 568, 437 N.W.2d 460 (1989). Unless a contract is ambiguous, parol evidence cannot be used to vary its terms. In interpreting a contract, a court must first determine, as a matter of law, whether the contract is ambiguous. *Fraternal Order of Police v. County of Douglas*, 259 Neb. 822, 612 N.W.2d 483 (2000). Whether a document is ambiguous is a question of law, and an appellate court considering such a question is obligated to reach a conclusion independent of the trial court's decision. *Callahan v. Washington Nat. Ins. Co.*, 259 Neb. 145, 608 N.W.2d 592 (2000). A determination as to whether ambiguity exists in a contract is to be made on an objective basis, not by the subjective contentions of the parties; thus, the fact that the parties have suggested opposite meanings of a disputed instrument does not necessarily compel the conclusion that the instrument is ambiguous. *Fraternal Order of Police v. County of Douglas, supra.*

Sack Brothers argues that certain admissions against interest by Tri-Valley representatives prove that Tri-Valley's intent was

to conduct an off-exchange futures transaction. Sack Brothers claims the testimony of certain witnesses regarding preagreement negotiations between the parties was admissible to explain the intent of the parties. It asserts that only by reviewing evidence outside the four corners of the contract could the trial court have determined the intent of the parties and that, therefore, the court erred in not admitting such evidence.

The trial court properly excluded evidence that the parties did not contemplate delivery of the corn. Although the contracts did not limit the number of times they could be rolled, the plain language of the contracts provided that the corn was to be physically delivered. With regard to deferring delivery, the contracts provided: "An additional service fee of 2 (two) cents per bushel will be assessed for each time the futures option month of the Hedge to Arrive is changed or rolled." Thus, the court correctly determined that parol evidence could not be used to contradict the written terms of the contracts regarding whether delivery was required.

We next consider whether the contracts are illusory. Sack Brothers asserts that it was entitled to summary judgment because the contracts are void as a matter of law in that they do not state specific delivery destinations. It also claims that because the contracts do not state a specific delivery date and may be rolled indefinitely, the contracts are illusory.

Sack Brothers also argues that the contracts lack the essential terms necessary to comply with the provisions of the Nebraska Uniform Commercial Code (U.C.C.) and should, therefore, be declared illusory in that they depend upon the will, wish, or pleasure of one of the parties. See, *Johnson Lakes Dev. v. Central Neb. Pub. Power*, 254 Neb. 418, 576 N.W.2d 806 (1998); *Pantano v. McGowan*, 247 Neb. 894, 530 N.W.2d 912 (1995).

The contracts are for the sale of goods in excess of $500 and are, therefore, governed by the U.C.C. The applicable portion of Neb. U.C.C. § 2-201 (Reissue 1992) states:

> (1) Except as otherwise provided in this section a contract for the sale of goods for the price of five hundred dollars or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a

contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his or her authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

The contracts are in writing and were signed by the parties. The contracts state the quantity of grain in bushels, indicate the grade of corn, and set forth the arrival period. The price is to be determined according to the terms of each contract. The "[d]estination" was not filled in on any of the four contracts. However, at the top of each contract, there is a list of the locations of Tri-Valley's grain elevators—St. Edward, Fullerton, Genoa, and Monroe, Nebraska. It can reasonably be inferred that one of these four elevators was the delivery destination. When two of the contracts were amended, St. Edward was written in as the delivery destination. We therefore conclude that the contracts are not illusory.

We next consider whether the contracts are cash-forward or futures contracts. Summary judgment is proper only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Gering - Ft. Laramie Irr. Dist. v. Baker*, 259 Neb. 840, 612 N.W.2d 897 (2000). On a motion for summary judgment, the question is not how a factual issue is to be decided, but whether any real issue of material fact exists. *Wait v. Cornette*, 259 Neb. 850, 612 N.W.2d 905 (2000).

The Commodity Exchange Act requires that transactions in commodity futures contracts take place only under the rules of a board of trade that has been designated by the Commodity Futures Trading Commission (CFTC). Excluded from regulation under the Commodity Exchange Act are contracts for "any sale of any cash commodity for deferred shipment or delivery," 7 U.S.C. § 1a(11), otherwise known as cash-forward contracts. However, the Commodity Exchange Act does not give any further guidance in distinguishing between an unregulated cash-

forward contract and a CFTC-regulated futures contract. As several courts have noted, it is the contemplation of physical delivery of the subject commodity that is the basic distinction between a futures contract and a cash-forward contract. *Grain Land Coop v. Kar Kim Farms, Inc.*, 199 F.3d 983 (8th Cir. 1999). If there is a legitimate expectation that actual delivery of a commodity between the seller and the original contracting buyer will occur, then the courts have determined that the contract is an exempt cash-forward contract. *Id.*; *Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308 (6th Cir. 1998).

As stated in *Nagel v. ADM Investor Services Inc.*, 65 F. Supp. 2d 740 (N.D. Ill. 1999), cash-forward contracts contemplate the delivery of the commodity, while futures contracts do not. With a cash-forward contract, the producer agrees to deliver an amount of corn or other grain at a specified time for an agreed price. The elevator spreads its risk of price change by purchasing a futures contract for the grain it has purchased from the farmer. The HTA contract is a cash-forward contract with a part of the price referred to as a "basis" left open. The basis price is the difference between the local cash price which is paid by the elevator and the futures price for the same commodity. Only the futures price is fixed at the time of the contract. The basis price is determined at the time the commodity is to be delivered.

Sack Brothers argues that the contracts were futures contracts because delivery was not required or the contractual obligation could be offset by delivery to third parties. In support of its argument, Sack Brothers notes that the contracts could be rolled, thus deferring delivery.

A similar argument was made in *Grain Land Coop*. There, the producer contended that the contracts permitted him to defer delivery indefinitely and therefore imposed no real obligation to deliver the grain. The court found that such features did not transform the HTA contracts into futures contracts. The ability to roll the contracts merely allowed the producer to delay the delivery obligation rather than to avoid it altogether. This issue was also addressed in *Nagel*, where the plaintiffs were farmers who had entered into HTA contracts with grain merchants. The contracts were referred to as "flexible or enhanced HTA agreements," 65 F. Supp. 2d at 743, because the

farmers were permitted to defer delivery to any month in which the futures contract expired. When a farmer deferred delivery, the grain merchant would buy in its existing "short position," *id.*, and take a new position in the new delivery month. This was referred to as "rolling the hedge." *Id.* The price payable on delivery of the grain was adjusted to reflect the difference between the cost of these positions plus a small fee (often 2 cents per bushel). Although the farmer never transacted on a futures exchange, the right to postpone delivery and obtain a new price afforded the farmer the economic attributes of options to establish short positions in the futures market. When the "spot price" dropped before the original delivery date, the farmer with such a contract would deliver and take his profit. *Id.* If the price of the cash commodity rose, the farmer was tempted to defer delivery, sell the crop for cash (obtaining a price higher than the one the grain merchant was required to pay), and hope that the price fell again before the new delivery date so that the farmer could cover his short position. If the price remained high, the farmer might again defer delivery, hoping for the price to drop.

The plaintiffs in *Nagel v. ADM Investor Services Inc.*, 65 F. Supp. 2d 740 (N.D. Ill. 1999), contended that the flexed HTA contracts were futures contracts and, therefore, unlawful. The U.S. District Court noted that the farmers' arguments in this respect have been uniformly unsuccessful in court and that no federal court has decided such a suit in favor of any farmer. The district court concluded that the farmers' ability to defer delivery under the HTA contracts was nothing more than simply a power to defer delivery under the terms of the contracts. The district court concluded that such contracts were cash-forward contracts and not futures contracts.

On appeal, the U.S. Court of Appeals for the Seventh Circuit affirmed. See *Nagel v. ADM Investor Services, Inc.*, 217 F.3d 436 (7th Cir. 2000). With respect to the fact that the contracts did not limit the number of times that they could be rolled, the Seventh Circuit pointed out that delivery could not be deferred forever, because the contracts required the farmer to pay an additional charge every time he rolled the hedge, and that there was a practical limit on how long delivery could be deferred.

In *Sack Bros. v. Great Plains Co-op, ante* p. 292, 616 N.W.2d 796 (2000), we noted the following factors in determining whether the contracts were futures contracts or cash-forward contracts: The contracts were expected to lead to delivery. The grain had inherent value to both the seller and the buyer. Payment would occur only upon delivery of the grain. The contracts were between a producer who was capable of delivering the commodity described in the contract and a merchant that was capable of taking delivery. The producer warranted that the commodity was capable of being tangibly exchanged. The terms of the contracts, including place of delivery, quantity, and price, were unique to each individual contract. The contracts were not fungible and could not be settled by buying offsetting positions. The trade was in the commodity described in the contract rather than in the contract itself. In order to defer delivery, the parties to the contracts had to mutually agree.

Here, Sack Brothers warranted that the grain was in its possession and was capable of being tangibly exchanged. Sack Brothers agreed to set a cash basis and to determine the cash price of the grain on or before the physical delivery of the grain or by the first notice day for the futures position, whichever came first. If Sack Brothers did not set the basis price according to the terms of the contract, Tri-Valley was authorized to set the cash basis and the cash price of the contract. An additional service fee of 2 cents per bushel was assessed each time the futures option month of the HTA contract was changed or rolled. If the grain was physically delivered to Tri-Valley's elevator, it agreed to rebate 2 cents per bushel. Tri-Valley was responsible for commissions and margin requirements with respect to the transactions, and Tri-Valley agreed that the transactions would be subject to the rules of the Chicago Board of Trade. Sack Brothers agreed to be financially responsible to Tri-Valley in the case of nondelivery of the grain covered by the contracts.

Tri-Valley is in the business of obtaining grain for resale. It relies on actual delivery to carry on its business and is capable of receiving delivery. Sack Brothers is a general partnership engaged in farming that produces the type of commodity named in the contracts. The terms of the contracts were individually negotiated. Each contract set forth the specific grade of grain,

arrival period, quantity, futures option, and futures option price. The contracts were not offered to the general public, but, instead, Tri-Valley entered into these contracts only with farmers who had the capacity to deliver the grain. Although the contracts allowed Sack Brothers to roll the delivery date, it was not practical for Sack Brothers to roll the delivery date indefinitely because each time it elected to defer, it was required to pay an additional charge. As noted in *Nagel v. ADM Investor Services, Inc.*, 217 F.3d 436 (7th Cir. 2000), this places a practical limit on how long delivery can be deferred. Sack Brothers was never relieved of its obligation to deliver. Therefore, we conclude that the contracts in question are cash-forward contracts exempt from the Commodity Exchange Act and that the trial court did not err in granting summary judgment as to this issue.

Sack Brothers' final argument is that the trial court erred in granting Tri-Valley's motion for summary judgment on the issue of damages. It claims that the damages were based on speculation and uncertainty. In any damage action for breach of contract, the claimant must prove that the breach of contract was the proximate cause of the damages. This requires a causal relationship between the damages asserted and the breach relied upon. *Sack Bros. v. Great Plains Co-op, ante* p. 292, 616 N.W.2d 796 (2000). Generally, while damages need not be proved with mathematical certainty, neither can they be established by evidence which is speculative and conjectural. *Id.* Uncertainty as to the fact of whether damages were sustained at all is fatal to recovery, but uncertainty as to the amount is not if the evidence furnishes a reasonably certain factual basis for computation of the probable loss. *Id.*

The trial court concluded that Tri-Valley learned of Sack Brothers' anticipatory breach of the contracts when Sack Brothers commenced this action on May 10, 1996, alleging that the contracts were unenforceable and that it had no intention of delivering under the contracts. The court found that Sack Brothers' evidence had not disputed the material facts of the market price and the contract price of each of the HTA contracts on May 10, nor the difference between the market price and the contract price.

The anticipatory breach of a contract is one committed before the time has come when there is a present duty of per-

324

formance and is the outcome of words or acts evidencing an intention to refuse performance in the future. *Chadd v. Midwest Franchise Corp.*, 226 Neb. 502, 412 N.W.2d 453 (1987). The question of whether there has been a repudiation or whether repudiation was justified is a question of fact which generally cannot be disposed of by summary judgment. See *id.* However, in the case at bar, the facts are not in dispute. Sack Brothers' second amended petition states: "[E]ach HTA agreement purporting to bind each Plaintiff and Defendant is unenforceable, and without legal effect . . . ." An admission made in a pleading on which trial is had is more than an ordinary admission; it is a judicial admission and constitutes a waiver of all controversies so far as an adverse party desires to take advantage of it, and therefore, it is a limitation of the issues. *Schweitzer v. American Nat. Red Cross*, 256 Neb. 350, 591 N.W.2d 524 (1999). Therefore, we conclude that Sack Brothers' intention to refuse performance on the HTA contracts was undisputed.

The filing of this declaratory judgment action was an unequivocal communication by Sack Brothers that it did not intend to perform, and Sack Brothers does not contend that it performed any of these contracts. In January 1996, Sack Brothers sold large volumes of corn to other elevators. After Tri-Valley requested that CSA mail a memorandum of understanding to the producers it represented, Sack Brothers filed this action, alleging the contracts were unenforceable. Thus, we conclude that calculation of the damages was not based on speculation or uncertainty and that the trial court did not err in granting summary judgment in favor of Tri-Valley on the issue of damages.

## CONCLUSION

Summary judgment was properly granted in favor of Tri-Valley on the issues of liability and damages. The contracts in question are cash-forward contracts, exempt from the Commodity Exchange Act, and are not illusory. In addition, the trial court did not err in excluding the parol evidence offered by Sack Brothers. Accordingly, the judgment of the trial court is affirmed.

AFFIRMED.

STEPHAN, J., not participating.