SACK BROTHERS, A NEBRASKA GENERAL PARTNERSHIP, ET AL.,
APPELLANTS, V. GREAT PLAINS COOPERATIVE, INC.,
A NEBRASKA CORPORATION, APPELLEE.
GREAT PLAINS COOPERATIVE, INC., A NEBRASKA CORPORATION,
APPELLEE, V. JOHN SANTIN, APPELLANT.
616 N.W. 2d 796

Filed September 1, 2000.   Nos. S-99-355, S-99-463, S-99-464,
S-99-465, S-99-658, S-99-703, S-99-705, S-99-706.

W. Craig Howell and James F. Cann, of Domina Law, P.C., for appellants Sack Brothers et al. and John Santin.

Thomas C. McGowan, Robert J. Bothe, John A. Andreasen, and James J. Niemeier, of McGrath, North, Mullin & Kratz, P.C., for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, McCORMACK, and MILLER-LERMAN, JJ.

WRIGHT, J.

## NATURE OF CASE

This opinion addresses eight appeals which we have consolidated for purposes of oral argument and opinion. In each case, the producer alleged that contracts entered into with Great Plains Cooperative, Inc. (Great Plains), violated the Commodity Exchange Act, 7 U.S.C. § 1 et seq. (1994 & Supp. IV 1998), in that they constituted futures commodities contracts and were illusory, while Great Plains alleged that each producer had breached its contracts by failing to perform the obligations required therein. The trial courts held in each case that the contracts were "forward contracts" excluded from the Commodity Exchange Act and Nebraska's Commodity Code, Neb. Rev. Stat. § 8-1701 et seq. (Reissue 1997), and that the contracts were enforceable and were not illusory. The trial courts subsequently awarded damages in favor of Great Plains, and the producers appealed.

## SCOPE OF REVIEW

■ In reviewing a summary judgment, an appellate court views the evidence in a light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Sherrets, Smith v. MJ Optical, Inc.*, 259 Neb. 424, 610 N.W.2d 413 (2000).

■ Summary judgment is proper only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Id.*

■ On a motion for summary judgment, the question is not how a factual issue is to be decided, but whether any real issue of material fact exists. *Fossett v. Board of Regents*, 258 Neb. 703, 605 N.W.2d 465 (2000).

■ Whether a document is ambiguous is a question of law, and an appellate court considering such a question is obligated to reach a conclusion independent of the trial court's decision. *Callahan v. Washington Nat. Ins. Co.*, 259 Neb. 145, 608 N.W.2d 592 (2000).

## FACTS

### GREAT PLAINS

At all relevant times, Great Plains was a Nebraska agricultural cooperative located in Benedict. It was owned by producers who shared in the residual profits of the cooperative. Part of Great Plains' business consisted of the purchase and resale of grain. Its facilities were located on a main railway line, which allowed it to handle large quantities of grain. It regularly took delivery of grain at its Benedict and Stromsburg terminals and then resold that grain to middlemen or end users. Purchases were made through a variety of contracts for deferred shipment and delivery.

### SACK BROTHERS

Sack Brothers is a partnership engaged in a farming operation in Howard County. At all relevant times, it farmed 3,000 acres of ground and controlled an additional 3,000 acres of pasture-land. During the period from February to May 1995, Sack Brothers entered into 12 contracts with Great Plains for the sale of 470,000 bushels of corn and 10,000 bushels of soybeans.

### T-4 FARMS

T-4 Farms is a partnership engaged in farming in Buffalo County, and at all relevant times, it farmed approximately 2,400 acres. During the period from January to April 1995, it entered into 10 contracts with Great Plains for the sale of 215,000 bushels of corn.

### DONALD HENDRICKSON

Donald Hendrickson is engaged in farming in Buffalo County, and at all relevant times, he farmed over 900 acres.

During the period from February to April 1995, Hendrickson entered into five contracts with Great Plains for the sale of 60,000 bushels of corn.

### PUTTERGILL LAND & CATTLE, INC.

Puttergill Land & Cattle, Inc., is engaged in a farming operation in Buffalo County. It is a Nebraska corporation with its principal place of business in Buffalo County, and at all relevant times, it farmed about 1,000 acres. During the period from February to May 1995, Puttergill Land & Cattle, Inc., entered into five contracts with Great Plains for the sale of 65,000 bushels of corn.

### JOHN SANTIN

John Santin resides near Fullerton, and at all relevant times, he farmed approximately 1,000 acres. During the period from February to May 1995, Santin entered into nine contracts with Great Plains for the sale of 85,000 bushels of corn.

### PG FARMS, INC.

PG Farms, Inc., is engaged in a farming operation in Polk County. It is a Nebraska corporation run by Paul Gangwish, and at all relevant times, it farmed approximately 1,700 acres. From March to May 1995, PG Farms, Inc., entered into four contracts with Great Plains for the sale of 20,000 bushels of corn and 2,000 bushels of soybeans.

### GANGWISH SEED FARMS, INC.

Gangwish Seed Farms, Inc., is engaged in a farming operation in Polk County. It is a Nebraska corporation run by Randall Gangwish, and at all relevant times, it farmed approximately 2,500 acres. In June 1995, Gangwish Seed Farms, Inc., entered into one contract with Great Plains for the sale of 75,000 bushels of corn.

### BUMGARNER LAND AND CATTLE CO.

Bumgarner Land and Cattle Co. is engaged in a farming operation in Fillmore County. It is a Nebraska corporation run by Thomas Bumgarner, and at all relevant times, it farmed 1,300 acres near Geneva. During the period from February to May

1995, Bumgarner Land and Cattle Co. entered into nine contracts with Great Plains for the sale of 190,000 bushels of corn.

### COMPETITIVE STRATEGIES FOR AGRICULTURE OF NEBRASKA

Each of the producers retained Competitive Strategies for Agriculture of Nebraska (CSA), a grain marketing consultant business, to negotiate contracts with Great Plains. CSA offered its services on a per-acre fee basis.

### CONTRACTS

All of the contracts at issue, which were prepared by Great Plains, bore the caption "Hedge to Arrive Contract." Each of the contracts contained the following terms:

This contract entered into between GREAT PLAINS COOP., Benedict, Ne. hereafter referred [to] as BUYER and _____ hereafter referred to as SELLER. BUYER and SELLER confirm and agree to the following.

Buyer confirms that the following futures transaction was made for Seller on the Chicago Board of Trade. Seller acknowledges that said grain is yet to have the "CASH PRICE" determined for arrival.

Seller warrants that the commodity represented under this contract are, will be, or are able to be in their possession and are therefore capable of being tangibly exchanged.

Seller states that he/she have an understanding of "cash basis". Cash basis is the difference between the futures and the posted cash price of the commodities designated period stated in this contract.

Seller agrees to set the "cash basis" to determine the cash price of the commodity in this contract prior to the first delivery day stated in this contract. Unless other terms have been agreed upon by Buyer and Seller prior to delivery, and the Seller has not set the price, Buyer will determine the "cash basis" and fix the price of the commodity stated in this contract. Seller further understands that the Buyer is not obligated to give prior notice.

Buyer is responsible for brokerage fees and margin requirements of this transaction. Seller agrees that this transaction is subject to the rules of the grain exchange that trades the commodity stated in this contract.

Seller agrees to a service fee of _____ cents per bushel to be assessed against the cash price established in this contract.

Non-performance by either party to this contract will cause the other party [to] initiate action to recover cost incurred due to non-performance.

This contract is being enter[ed] into between BUYER and SELLER on _____ 1994.

BUYER: GREAT PLAINS COOPERATIVE

BY: _____

SELLER:

BY: _____

On the right-hand side of the contract, the parties would insert in handwriting the type and grade of grain, delivery information, destination, number of bushels, futures contract, futures price, final pricing date, cash basis, and cash price. There was also an area for comments. These terms were privately negotiated between CSA, as the agent for the producer, and Great Plains.

The price the producers would receive for the grain was determined by first establishing a futures price which utilized the price being offered for the same commodity on the Chicago Board of Trade for the delivery month requested by the producer. The futures price was equivalent to the price at which Great Plains hedged the producer contract with the Chicago Board of Trade. In addition to the futures price, the "cash basis" had to be set in order to establish the price the producer would receive upon delivery under the contract. The cash basis was the difference between the cash price Great Plains paid for grain on a given day and the futures price for the same grain on the same day. The cash basis generally reflected the cost of delivery to market of the commodity and fluctuated daily in response to such factors as local transportation costs, supply and demand, and costs of operation. The contract required that the producer set the cash basis for the contract prior to the first delivery day for the contract delivery or futures month in the contract. If the contract specified a futures price for December, the producer was required to set the basis price prior to November 25 and deliver the corn during December.

In the event that a producer could not meet the delivery schedule, the producer could solicit Great Plains to amend, or "roll," the delivery date. If the producer did not set the cash basis or was not allowed to amend the delivery date, Great Plains could set the basis price after that date without further notice, thereby fixing the cash price due on arrival, and could require delivery of the commodity during the futures month the producer had selected. When the cash basis was set by either the producer or Great Plains, the price was fixed by the formula in the contract and was subject to any premiums or discounts applied upon the delivery and testing of the grain.

In the event that the parties agreed that the original delivery date could be changed, the contract was modified accordingly, and there was a corresponding change in the futures price. The new contract futures price was calculated based on a formula which referenced to the original futures price and the current futures price for the amended delivery date. The pricing formula compared the difference between the Chicago Board of Trade price for the delivery month specified and the Chicago Board of Trade price for the month to which the producer sought to defer its delivery. If the difference between the price for the delivery month referenced in the contract and the new delivery date was a positive number, that amount was added to the original contract reference price. If the difference was negative, it was subtracted from the contract's original reference price. In the event that the parties agreed to a modification, the producer agreed to pay Great Plains a per-bushel fee to cover its administrative costs incurred in agreeing to the modification.

CSA was the marketing agent for each of the producers in contracting with Great Plains. The producers did not speak to or communicate with any employee or representative of Great Plains regarding the terms of the contracts. In general, Jeff Wichmann, as the marketing agent for CSA, would contact Great Plains with regard to selling grain. Wichmann would fill out the right side of the contract form with the type of grain, number of bushels, and the futures price requested and then convey that offer to Great Plains via telephone or fax. If the offer was accepted, Great Plains would then complete the contract and send it directly to the producer for signing. The destination

and delivery date terms were left open to allow the producer and Great Plains flexibility in marketing the grain. None of the grain which is the subject of these contracts was ever delivered to Great Plains.

### DECLARATORY JUDGMENT ACTIONS

The producers initiated all but one of these actions, seeking to have the contracts declared void and unenforceable. The producers alleged, inter alia, that the contracts were unenforceable illusory contracts; were not supported by consideration; violated the Commodity Exchange Act in that they constituted futures commodities contracts, as opposed to "cash-forward contracts"; and violated state and federal securities law. Great Plains' counterclaim alleged damages for breach of contract.

Great Plains sued Santin (case No. S-99-658) in the district court for Nance County, seeking to enforce nine purchase contracts entered into between Great Plains and Santin. Santin counterclaimed, alleging that the hedge-to-arrive (HTA) contracts were unenforceable as a matter of law and were voidable as being illusory, not supported by adequate consideration, and in violation of the federal securities laws and the Securities Act of Nebraska.

### FINDINGS OF TRIAL COURTS

In the cases involving Sack Brothers (case No. S-99-355), T-4 Farms (case No. S-99-463), Hendrickson (case No. S-99-464), and Puttergill Land & Cattle, Inc. (case No. S-99-465), the Howard County District Court found that the contracts were forward contracts excluded from the Commodity Exchange Act and Nebraska's Commodity Code. The court concluded that the contracts were between a seller engaged in the business of producing grain and a buyer engaged in the business of buying grain and that the contracts were not investment contracts sold in violation of Nebraska's "Blue Sky" laws, the Securities Act of Nebraska, the Securities Act of 1933, or the Securities Exchange Act of 1934. The court also found that the contracts were written in clear and unambiguous language and that the producers had failed to deliver the grain to Great Plains as required and had anticipatorily breached the contracts.

The court granted summary judgment in favor of Great Plains, and on January 15, 1999, the court heard the motions for summary judgment on the issue of damages. The court concluded that Great Plains had elected to recover only its out-of-pocket losses and that such losses were as follows: Sack Brothers, $812,723; T-4 Farms, $368,370; Hendrickson, $99,005; and Puttergill Land & Cattle, Inc., $137,153. The court entered judgment for those amounts with interest at the rate of 5.584 percent from March 10, 1999.

The Nance County District Court granted summary judgment in favor of Great Plains and against Santin (case No. S-99-658), finding that the contracts were cash-forward contracts exempt from and not in violation of the Commodity Exchange Act or Nebraska's Commodity Code. The court concluded that the contracts were not securities and did not violate the Securities Act of Nebraska, the Securities Act of 1933, or the Securities Exchange Act of 1934 and were legally binding, valid, and enforceable. Further, the court found that Santin had failed to deliver the grain to Great Plains as required under the contracts and had committed an anticipatory breach of each contract. The court also granted summary judgment in favor of Great Plains on the issue of damages. The court noted that Great Plains was seeking its out-of-pocket losses and awarded Great Plains $140,017.50 with interest at the rate of 5.732 percent from April 15, 1999.

In the Polk County District Court, PG Farms, Inc. (case No. S-99-703); Gangwish Seed Farms, Inc. (case No. S-99-705); and Bumgarner Land and Cattle Co. (case No. S-99-706) made similar allegations concerning the validity of the contracts. Great Plains made similar counterclaims as to breach of the contracts. The court determined as a matter of law that the contracts were cash-forward contracts, that Nebraska's Commodity Code did not apply, that the contracts did not violate state or federal securities laws, and that the contracts were not illusory. The court concluded that the contracts were binding regardless of the absence of the producers' signatures. On April 15, 1999, the court entered summary judgments in favor of Great Plains and awarded damages in favor of Great Plains for its out-of-pocket losses against PG Farms, Inc., in the amount of $32,810; against

Gangwish Seed Farms, Inc., in the amount of $114,600; and against Bumgarner Land and Cattle Co. in the amount of $324,207.50. Interest on each of these judgments accrued at the rate of 5.732 percent.

## ASSIGNMENTS OF ERROR

The producers assign as error that the trial courts erred in (1) denying their motions for summary judgment, (2) sustaining Great Plains' motions for summary judgment on the issue of liability, (3) disregarding material evidence pursuant to the parol evidence rule, and (4) sustaining Great Plains' motions for summary judgment on the issue of damages.

## ANALYSIS

In each of the cases before us, both sides moved for summary judgment, contending that there were no material issues of fact in dispute and that they were entitled to judgment as a matter of law. When adverse parties have each moved for summary judgment and the trial court has sustained one of the motions, the reviewing court obtains jurisdiction over both motions and may determine the controversy which is the subject of those motions or make an order specifying the facts which appear without substantial controversy and direct further proceedings as it deems just. *Callahan v. Washington Nat. Ins. Co.*, 259 Neb. 145, 608 N.W.2d 592 (2000). In reviewing a summary judgment, an appellate court views the evidence in a light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Sherrets, Smith v. MJ Optical, Inc.*, 259 Neb. 424, 610 N.W.2d 413 (2000).

In conjunction with their argument that the trial courts erred in granting summary judgment in favor of Great Plains, the producers assert that the trial courts erred in disregarding certain evidence based on the parol evidence rule. The trial courts held that the parol evidence rule precluded consideration of contemporaneous oral agreements or negotiations between the producers via their agent, CSA, and Great Plains regarding delivery of the commodity and whether the delivery dates could be postponed indefinitely. The producers argue that distinguishing between a futures transaction and a cash-forward transaction

requires the examination of a variety of factors in order to determine the nature of the contract. They assert that the trial courts erroneously concluded that evidence offered by the producers was an attempt to vary the terms of the contract rather than to show the intent of the parties. They claim that the contracts were ambiguous and that parol evidence was necessary to prove the intent of the parties with regard to delivery and the understanding of the parties regarding the intent of the producers to roll, or defer, the delivery dates, which would establish that the contracts were in fact futures contracts and not cash-forward contracts.

We therefore begin our analysis by considering whether the trial courts erred in not allowing the producers to introduce certain parol evidence relating to the contracts. The producers urge us to look beyond the four corners of the contracts and review all relevant circumstances in the underlying nature of the transactions.

■ The parol evidence rule renders ineffective proof of a prior or contemporaneous oral agreement which alters, varies, or contradicts the terms of a written agreement. *Five Points Bank v. White*, 231 Neb. 568, 437 N.W.2d 460 (1989).

> "If negotiations between the parties result in an agreement which is reduced to writing, the written agreement is the only competent evidence of the contract in the absence of fraud, mistake, or ambiguity. . . . Oral testimony is not admissible under the ambiguity exception to the parol evidence rule to establish an understanding at variance with the plain terms of the written instrument."

*Id.* at 571, 437 N.W.2d at 462, quoting *Sederstrom v. Burge*, 216 Neb. 512, 343 N.W.2d 770 (1984).

We conclude that the trial courts did not err in excluding parol evidence that varied the terms of the contracts. The statements made by CSA concerning the deferring of delivery are attempts to vary the unambiguous provisions of the contracts.

The contracts required that the producer set the cash basis for the contracts prior to the first delivery day for the contract delivery or futures month in the contracts. The cash basis was defined as "the difference between the futures and the posted cash price of the commodities designated period stated in this contract." If,

for example, the contract specified a futures price for December, the producer was required to set the basis price prior to November 25 and deliver the corn during December. There was nothing in the contract that permitted the producer to roll the delivery date. The producer could solicit Great Plains to roll the delivery date, but this required the consent of Great Plains. If the parties agreed to roll the delivery date, the contract was modified accordingly and there was a corresponding change in the futures price. The new futures price was calculated based on a formula which referenced the original futures price and the current futures price for the amended delivery date. The fact that the delivery and destination terms were left "open" does not make the contract ambiguous. Therefore, the provisions of the contracts as to delivery or deferring the delivery dates could not be contradicted by parol evidence. Oral testimony is not admissible to vary the plain terms of the written contracts. Whether a document is ambiguous is a question of law, and an appellate court considering such a question is obligated to reach a conclusion independent of the trial court's decision. *Callahan v. Washington Nat. Ins. Co.*, 259 Neb. 145, 608 N.W.2d 592 (2000).

We next address the issue of whether the contracts were futures contracts which would be regulated by the Commodity Exchange Act or whether the contracts were cash-forward contracts exempted from the act.

Summary judgment is proper only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Sherrets, Smith v. MJ Optical, Inc.*, 259 Neb. 424, 610 N.W.2d 413 (2000). On a motion for summary judgment, the question is not how a factual issue is to be decided, but whether any real issue of material fact exists. *Fossett v. Board of Regents*, 258 Neb. 703, 605 N.W.2d 465 (2000). We conclude that there are no material issues of fact in dispute, and our determination of whether the contracts are futures contracts or cash-forward contracts is a question of law.

The Commodity Exchange Act requires that transactions in commodity futures contracts take place only under the rules of

a board of trade that has been designated by the Commodity Futures Trading Commission (CFTC). Excluded from Commodity Exchange Act regulation are contracts for "any sale of any cash commodity for deferred shipment or delivery," 7 U.S.C. § 1a(11), otherwise known as cash-forward contracts. The Commodity Exchange Act offers no further guidance in distinguishing between an unregulated cash-forward contract and a CFTC-regulated futures contract.

Because the issue has been considered in other jurisdictions, a review of cases which involved HTA contracts is helpful to our analysis. In *Salomon Forex, Inc. v. Tauber*, 8 F.3d 966, 971 (4th Cir. 1993), the court explained the difference between these two types of contracts:

> A "futures contract," or "future," never precisely defined by statute, nevertheless has an accepted meaning which brings it within the scope of transactions historically sought to be regulated by the [Commodity Exchange Act].
>
> It is generally understood to be an executory, mutually binding agreement providing for the future delivery of a commodity on a date certain where the grade, quantity, and price at the time of delivery are fixed. To facilitate the development of a liquid market in these transactions, these contracts are standardized and transferrable. Trading in futures seldom results in physical delivery of the subject commodity, since the obligations are often extinguished by offsetting transactions that produce a net profit or loss. The main purpose realized by entering into futures transactions is to transfer price risks from suppliers, processors and distributors (hedgers) to those more willing to take the risk (speculators). Since the prices of futures are contingent on the vagaries of both the production of the commodity and the economics of the marketplace, they are particularly susceptible to manipulation and excessive speculation.
>
> In contrast to the fungible quality of futures, cash forwards are generally individually negotiated sales of commodities between principals in which actual delivery of the commodity is anticipated, but is deferred for reasons of commercial convenience or necessity. These contracts are not readily transferable and therefore are usually entered

into between parties able to make and receive physical delivery of the subject goods.

In *Nagel v. ADM Investor Services Inc.*, 65 F. Supp. 2d 740, 751 (N.D. Ill. 1999), the court also summarized the differences between futures and forward contracts:

In futures markets, people buy and sell contracts, not commodities. Terms are standardized, and each party's obligation runs to an intermediary, the clearing corporation. Clearing houses eliminate counterparty credit risk. Standard terms and an absence of counterparty-specific risk make the contracts fungible, which in turn makes it possible to close a position by buying an offsetting contract. All contracts that expire in a given month are identical; each calls for delivery of the same commodity in the same place on the same day. Forward contracts under § 1a(11), by contrast, call for sale of the commodity; no one deals "in the contract"; it is not possible to close a position by buying an offsetting position, because there are no fungible promises; delivery is idiosyncratic rather than centralized.

The general nature of HTA contracts was also discussed in *Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 319 (6th Cir. 1998):

[I]n a basic HTA contract, a farmer and grain elevator enter into a contract that contemplates delivery of a specified quantity of grain at a fixed point in time in the future. To eliminate the risk of change in the futures reference price, the elevator then "hedges" its contract with the farmer by establishing a "short" futures position, *i.e.*, an equal and opposite position, in the futures market. An HTA contract may be "flexible," which allows the parties to "roll forward" the delivery date to sometime in the future. When an HTA is rolled forward, the elevator buys back the original futures hedge and rehedges by selling a new futures contract in the futures market. The spread between the bought back and sold futures is attached to the price per bushel of the original HTA contract with the farmer. This change may be either a debit or a credit, and the farmer runs the risk of having the spread run against him.

In *Nagel v. ADM Investor Services, Inc.*, 217 F.3d 436, 438-39 (7th Cir. 2000), the court discussed the terms and conditions of an HTA contract:

> The hedging feature that gives the HTA contract its name comes from the fact that the contract price is a price specified in a futures contract that the merchant buys on a commodity exchange and that expires in the month specified for delivery under the merchant's contract with the farmer (the HTA contract). This arrangement hedges the merchant against price fluctuations between signing and delivery. The merchant is "long" in his contract with the farmer (the forward contract) in the sense that, if price rises, he's to the good, because the price was fixed earlier, in the contract, and so he bought the farmer's grain cheap. But if the price of grain falls, he's hurt, because he's stuck with a contract price that is higher than the current price. To offset this risk he goes "short" in the futures contract—that is, he agrees to sell an offsetting quantity of grain at the same price as fixed in the forward contract. If the price of grain falls during the interval between the signing of and delivery under the forward contract, though he loses on the forward contract, as we have seen, he makes up the loss in the futures contract, where he is the seller and therefore benefits when the market price falls below the contract price: The loss he would otherwise sustain as a result of having to resell the farmer's grain at a lower price than the price fixed in his contract with the farmer is offset by his profit on the futures contract. In sum, the price in the contract between farmer and merchant fixed by reference to the futures contract made by the merchant protects the farmer against price fluctuations between the signing of the contract and the delivery of the grain (just because it is a fixed price and so is unaffected by any change in market price during this interval), while the futures contract itself protects the merchant from the risk of loss should the price plummet during that interval.
>
> That's a simple HTA contract; the "flex" feature of the HTA contracts involved in this case comes from the fact that they allow the farmer to defer delivery of the grain. . . . Such a contract specifies a delivery date but allows the

farmer, upon the payment of a fee and an appropriate adjustment in the price to reflect changed conditions, to defer delivery beyond that date. A farmer who exercises this deferral option is doing what is called "rolling the hedge." The merchant, if he wants to hedge against price fluctuations during the extended period of the contract, will close out his existing futures contract by buying an offsetting contract and will then buy a new futures contract to expire at the new delivery date. . . .

. . . If the market price rose between the signing of the original contract with the merchant and the delivery date specified in the contract, and the farmer expected it to fall later, he could, by rolling the hedge, sell his grain at the current market price (since he wouldn't have to deliver it to the merchant), which by assumption is higher than the price fixed in the contract; and then, just before the new delivery date, he could buy at the then current price, expected to be lower, the amount of grain he was obligated to deliver and deliver it at the price fixed in the contract. The flex feature thus enables the farmer to speculate on fluctuations in the market price of his grain.

The U.S. Court of Appeals for the Eighth Circuit recently dealt with similar contracts in *Grain Land Coop v. Kar Kim Farms, Inc.*, 199 F.3d 983 (8th Cir. 1999). The court was called upon to consider the Commodity Exchange Act's application to a particular arrangement for the sale of grain.

In summary, the facts were similar to the cases before us. The contracts called for the delivery of a fixed quantity of grain at an unspecified time. The sale price was determined with reference to futures contract prices from the Chicago Board of Trade plus or minus a basis price, which was the difference between the cash price of the designated futures contract and the cash price for that same commodity. The basis price was deferred until the producer elected to fix it at a point prior to the 25th day of the month preceding the futures reference month. The purchaser was required to establish an offsetting position on the Chicago Board of Trade equal to its buy obligation under the contract. The contract also allowed the producer to defer delivery, which would result in a modification to the contract.

The trial court concluded that the contracts were cash-forward contracts and excluded from the Commodity Exchange Act. The Eighth Circuit affirmed on appeal. The court used an individualized multifactor approach which scrutinized each transaction for such characteristics as whether the parties were in the business of obtaining or producing the subject commodity, whether they were capable of delivering or receiving the commodity in the quantities provided for in the contract, whether there was a definite date of delivery, whether the agreement explicitly required actual delivery as opposed to allowing the delivery obligation to be rolled indefinitely, whether payment took place only upon delivery, and whether the contract terms were individualized rather than standardized.

This multifactor approach has been applied in *Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308 (6th Cir. 1998); *Commodity Futures Trading v. Noble Metals Intern.*, 67 F.3d 766 (9th Cir. 1995); *Oeltjenbrun v. CSA Investors, Inc.*, 3 F. Supp. 2d 1024 (N.D. Iowa 1998); and *Top of Iowa Co-op. v. Sime Farms, Inc.*, 608 N.W.2d 454 (Iowa 2000). One variation of the multifactor approach was used in *Nagel v. ADM Investor Services, Inc.*, 217 F.3d 436, 441 (7th Cir. 2000), where the Seventh Circuit adopted a "refinement" of the multifactor approach. The court analyzed three circumstances to determine whether the contract was a cash-forward contract: (1) the contract specifies idiosyncratic terms regarding place of delivery, quantity, or other terms; (2) the contract is between industry participants, such as farmers and grain merchants; and (3) delivery cannot be deferred forever. The court determined that if these three features were present, it was reasonable to conclude that delivery was contemplated by the parties, and thus, the contract would be a cash-forward contract.

Upon examination of the contracts in the cases at bar, we note the following factors: The contracts are expected to lead to delivery. The grain has inherent value to both the seller and the buyer. Payment will occur only upon delivery of the grain. The contracts are between a producer and a merchant (Great Plains), which merchant is capable of taking and delivering the commodity described in the contract. The producer warrants that the commodity is capable of being tangibly exchanged. The terms

of the contracts, including place of delivery, quantity, and price, are unique to each individual contract.

The contracts are not fungible. They cannot be settled by buying offsetting positions. The trade is in the commodity described in the contract rather than in the contract itself. A nonfungible contract that cannot be traded on an exchange is not a security. See, *Marine Bank v. Weaver*, 455 U.S. 551, 102 S. Ct. 1220, 71 L. Ed. 2d 409 (1982); *Nagel v. ADM Investor Services Inc.*, 65 F. Supp. 2d 740 (N.D. Ill. 1999). There is no provision in the contracts which states that delivery may be deferred indefinitely. In order to defer delivery, the parties must mutually agree.

Thus, we conclude as a matter of law that the contracts in question are cash-forward contracts exempt from the Commodity Exchange Act and that the trial courts did not err in granting summary judgment as to this issue.

The producers contend that the contracts are void as a matter of law because they are illusory. They assert that the contracts do not contain specific delivery destinations or dates, that delivery may be deferred indefinitely, and that therefore the contracts do not set forth the essential terms necessary in a contract for the sale of goods. They argue that the contracts lack the essential terms necessary to comply with the Nebraska Uniform Commercial Code (U.C.C.) and should be declared illusory in that they depend upon the wish and pleasure of one of the parties.

The applicable provision of Neb. U.C.C. § 2-201 (Reissue 1992) provides:

> Except as otherwise provided in this section a contract for the sale of goods for the price of five hundred dollars or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his or her authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

Each contract is evidenced in writing and states the quantity of the specific commodity in bushels. The contracts provide for the sale of goods, and the value of the goods in each contract

exceeds $500. However, the record shows that some of the producers did not sign all of the contracts or the amendments to the same. The trial court noted in its orders regarding PG Farms, Inc. (case No. S-99-703); Gangwish Seed Farms, Inc. (case No. S-99-705); and Bumgarner Land and Cattle Co. (case No. S-99-706) that § 2-201(2)(a) provides an exception to the general rule that a contract must be signed by the party to be charged:

> "Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its contents is given within ten days after it is received."

The trial court concluded that the parties were merchants within the meaning of the U.C.C. and that, therefore, upon receipt of the contracts and failure to object to the lack of signatures, the contracts were binding regardless of the absence of the producers' signature.

> [E]xperienced grain producers who regularly grow and market grain on the open market as the principal means of providing for their livelihood, and by reason of such occupation have acquired and possess knowledge or skill peculiar to the practices and operations of grain marketing, are merchants within the meaning of Neb. U.C.C. §§ 2-104 and 2-201 (Reissue 19[92]).

*Agrex, Inc. v. Schrant,* 221 Neb. 604, 608, 379 N.W.2d 751, 754 (1986). Accordingly, the trial court correctly determined that even though some of the contracts were not signed, they were binding pursuant to § 2-201(2)(a). Thus, we conclude that the contracts contained all the necessary terms to be in compliance with the U.C.C. and were not illusory.

Finally, the producers argue that the trial courts erred in sustaining Great Plains' motions for summary judgment on the issue of damages. They claim that the damages were based upon speculation and uncertainty.

In any damage action for breach of contract, the claimant must prove that the breach of contract was the proximate cause of the damages. This requires a causal relationship

between the damages asserted and the breach relied upon. *Union Ins. Co. v. Land and Sky, Inc.*, 253 Neb. 184, 568 N.W.2d 908 (1997). Generally, while damages need not be proved with mathematical certainty, neither can they be established by evidence which is speculative and conjectural. *Snyder v. Contemporary Obstetrics & Gyn.*, 258 Neb. 643, 605 N.W.2d 782 (2000). Uncertainty as to the fact of whether damages were sustained at all is fatal to recovery, but uncertainty as to the amount is not if the evidence furnishes a reasonably certain factual basis for computation of the probable loss. *Union Ins. Co. v. Land and Sky, Inc., supra.*

In calculating the damages, the trial courts referred to the supplemental affidavit of Kent Allen, who was at all relevant times president of the board of directors of Great Plains. As the trial courts noted, Great Plains elected to recover only its out-of-pocket losses. Allen described these as "the costs to liquidate the Great Plains' hedge of the [producers'] contracts together with the fees agreed to be paid by [the producers, which] does not include any brokerage fees or margin paid by Great Plains with respect to that hedge." Based on these calculations, the trial courts found Great Plains' damages to be as follows: Sack Brothers, $812,723; T-4 Farms, $368,370; Hendrickson, $99,005; Puttergill Land & Cattle, Inc., $137,153; Santin, $140,017.50; PG Farms, Inc., $32,810; Gangwish Seed Farms, Inc., $114,600; and Bumgarner Land and Cattle Co., $324,207.50.

We conclude that the calculation of damages was not based upon speculation or uncertainty. Great Plains elected to recover the out-of-pocket losses it suffered as a result of the producers' failing to deliver and thereby breaching the contracts at issue in these appeals. The trial courts did not err in granting summary judgment in favor of Great Plains on the issue of damages.

## CONCLUSION

Summary judgment was properly granted in favor of Great Plains on the issue of liability. The contracts are cash-forward contracts, are exempt from the Commodity Exchange Act, and are not illusory. Summary judgment was also properly granted in favor of Great Plains on the issue of damages, and the dam-

ages were not based upon speculation or uncertainty. Accordingly, the judgments of the trial courts are affirmed.

AFFIRMED.

STEPHAN, J., not participating.