Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
11/09/2020 02:10 AM CST

George Clift Enterprises, Inc., a Texas corporation,
doing business as Eslabon Properties, appellant and
cross-appellee, v. Oshkosh Feedyard Corporation,
a Nebraska corporation, and Terry Jessen,
appellees and cross-appellants, and
Jeff Betley et al., appellees.

___ N.W.2d ___

Filed August 14, 2020.   No. S-19-700.

1. **Motions for Continuance: Appeal and Error.** A trial court's grant or denial of a continuance is within the discretion of the trial court, whose ruling will not be disturbed on appeal in the absence of an abuse of discretion.

2. **Attorney Fees: Appeal and Error.** On appeal, an appellate court will uphold a lower court's decision allowing or disallowing attorney fees for frivolous or bad faith litigation in the absence of an abuse of discretion.

3. **Moot Question: Justiciable Issues: Appeal and Error.** Mootness is a justiciability question that an appellate court determines as a matter of law when it does not involve a factual dispute.

4. **Pretrial Procedure.** Generally, the control of discovery is a matter for judicial discretion.

5. **Summary Judgment: Motions for Continuance: Affidavits.** Neb. Rev. Stat. § 25-1335 (Reissue 2016) provides a safeguard against an improvident or premature grant of summary judgment.

6. ____: ____: ____. As a prerequisite for a continuance, additional time, or other relief, a party is required to submit an affidavit stating a reasonable excuse or good cause for the party's inability to oppose a summary judgment motion.

7. **Summary Judgment: Motions for Continuance: Pretrial Procedure.** In ruling on a request for a continuance or additional time in which to respond to a motion for summary judgment, a court may consider

- 776 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
306 NEBRASKA REPORTS
GEORGE CLIFT ENTERS. v. OSHKOSH FEEDYARD CORP.
Cite as 306 Neb. 775

whether the party has been dilatory in completing discovery and preparing for trial.

8. **Appeal and Error.** To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error.

9. **Brokers: Property: Contracts: Sales.** A broker employed for a definite time to effect a sale of property must perform whatever obligations the contract imposes upon the broker within the time limited.

10. **Brokers: Real Estate: Contracts: Sales.** Ordinarily, a real estate broker who, for a commission, undertakes to sell land on certain terms and within a specified period is not entitled to compensation for his or her services unless he or she produces a purchaser within the time limit who is ready, willing, and able to buy upon the terms prescribed.

11. **Brokers: Contracts: Sales.** The right to compensation based on the broker's production of a purchaser ready, willing, and able to buy upon terms specified by the principal or satisfactory to him or her is not impaired by the subsequent inability or unwillingness of the owner to consummate the sale on the terms prescribed.

12. ____: ____: ____. In a listing agreement contemplating the negotiation of terms, a commission is not earned by the broker until an agreement upon the terms is reached between the buyer and seller.

13. **Brokers: Property: Contracts: Sales.** When the broker has failed to perform the condition upon which he or she was to be paid, there is an end to the contract; all contractual obligations of the owner toward the broker are terminated and the parties stand as if a contract had never been made; the market for the sale of the owner's property is not circumscribed by the fact that some or all available purchasers have theretofore been approached by the broker.

14. **Brokers: Contracts: Sales.** Clauses in exclusive listing agreements setting forth a protection, extension, or safety period after the listing period are strictly construed as setting the limits of the time period in which a sale must take place for a commission to be recoverable.

15. ____: ____: ____. Protection clauses are meant to protect a broker from losing a commission earned during a listing period due to evasive conduct of the buyer and seller.

16. **Contracts: Waiver: Proof.** A written contract may be waived in whole or in part, either directly or inferentially, and the waiver may be proved by express declarations manifesting the intent not to claim the advantage, or by so neglecting and failing to act as to induce the belief that it was the intention to waive.

17. **Breach of Contract: Damages: Proximate Cause: Proof.** In any damage action for breach of contract, the claimant must prove that

- 777 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
306 NEBRASKA REPORTS
GEORGE CLIFT ENTERS. v. OSHKOSH FEEDYARD CORP.
Cite as 306 Neb. 775

the breach of contract complained of was the proximate cause of the alleged damages.

18. **Breach of Contract: Damages.** There must be a causal relationship between the damages asserted and the breach of contract relied upon.

19. **Judgments: Breach of Contract: Damages: Proof.** Proof which leaves the causal relationship between the damages asserted and the breach of contract relied upon in the realm of speculation and conjecture is insufficient to support a judgment.

20. **Conspiracy: Words and Phrases.** A civil conspiracy is a combination of two or more persons to accomplish by concerted action an unlawful or oppressive object, or a lawful object by unlawful or oppressive means.

21. **Conspiracy: Torts: Proof.** A claim of civil conspiracy requires the plaintiff to establish that the defendants had an expressed or implied agreement to commit an unlawful or oppressive act that constitutes a tort against the plaintiff.

22. **Conspiracy: Damages.** The gist of a civil conspiracy action is not the conspiracy charged, but the damages the plaintiff claims to have suffered due to the wrongful acts of the defendants.

23. **Actions: Conspiracy.** A civil conspiracy is actionable only if the alleged conspirators actually committed some underlying misconduct.

24. **Actions: Conspiracy: Torts.** Without an underlying tort, there can be no cause of action for a conspiracy to commit the tort.

25. **Torts: Intent: Proof.** To succeed on a claim for tortious interference with a business relationship or expectancy, a plaintiff must prove (1) the existence of a valid business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an unjustified intentional act of interference on the part of the interferer, (4) proof that the interference caused the harm sustained, and (5) damage to the party whose relationship or expectancy was disrupted.

26. ____: ____: ____. One of the basic elements of tortious interference with a business relationship requires an intentional act that induces or causes a breach or termination of the relationship or expectancy.

27. **Brokers: Real Estate: Contracts: Sales.** Real estate broker agreements, like other contracts, contain an implied covenant of good faith pursuant to which the seller impliedly covenants he or she will do nothing that will have the effect of destroying or injuring the right of the broker to earn a commission.

28. **Judges: Words and Phrases.** A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.

- 778 -

Nebraska Supreme Court Advance Sheets
306 Nebraska Reports
GEORGE CLIFT ENTERS. v. OSHKOSH FEEDYARD CORP.
Cite as 306 Neb. 775

29. **Actions: Attorney Fees: Words and Phrases.** Frivolous for the purposes of Neb. Rev. Stat. § 25-824 (Reissue 2016) is defined as being a legal position wholly without merit, that is, without rational argument based on law and evidence to support a litigant's position in the lawsuit.
30. **Words and Phrases.** Frivolous connotes an improper motive or legal position so wholly without merit as to be ridiculous.
31. **Judgments: Claims: Words and Phrases.** The determination of whether a particular claim or defense is frivolous must depend upon the facts of the particular case.
32. **Moot Question.** Mootness refers to events occurring after the filing of a suit, which eradicate the requisite personal interest in the resolution of the dispute that existed at the beginning of the litigation.
33. **Appeal and Error.** An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it.
34. **Attorney Fees: Appeal and Error.** Allocation of amounts due between offending parties and attorneys is "part and parcel" of the determination of the amount of an award and is reviewed for an abuse of discretion.

Appeal from the District Court for Garden County: DEREK C. WEIMER, Judge. Affirmed in part, and in part reversed and remanded with directions.

James R. Korth, of Reynolds, Korth & Samuelson, P.C., L.L.O., for appellant.

Sterling T. Huff, P.C., L.L.O., for appellees Oshkosh Feedyard Corporation and Terry Jessen.

David W. Pederson, of Pederson Law Office, for appellees Jeff Betley et al.

HEAVICAN, C.J., MILLER-LERMAN, CASSEL, STACY, FUNKE, PAPIK, and FREUDENBERG, JJ.

FREUDENBERG, J.
## I. NATURE OF CASE
A real estate agency appeals from an order of summary judgment against it in an action brought against the seller and buyers for the alleged breach of an exclusive listing

- 779 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
306 NEBRASKA REPORTS
GEORGE CLIFT ENTERS. v. OSHKOSH FEEDYARD CORP.
Cite as 306 Neb. 775

agreement and tortious interference with a contract, business relationship, or expectation. The sale at issue occurred both after the listing period and after the protection period of the agreement, and no commission was paid. All negotiations for the sale were conducted directly between the seller and buyers with the real estate agent's knowledge, and the defendants all denied any bad faith attempt to delay reaching an agreement or consummating the sale until after expiration of the exclusive listing agreement. On appeal, the real estate agency argues that the summary judgment hearing, held approximately 18 months after the action was filed, was premature because the agency had not yet conducted depositions. It also contests the court's determination that attorney fees were appropriate on the ground that the action was frivolous.

## II. BACKGROUND

This action involves the sale of a feedyard formerly owned by Oshkosh Feedyard Corporation (Oshkosh Feedyard). Oshkosh Feedyard is owned 100 percent by the Jessen Family Limited Partnership. The Jessen Family Limited Partnership has three general partners, Terry Jessen (Jessen), Gwen Jessen, and Joni Cowan. Summer Parker and Mariah Preistle are limited partners. Jessen is the president of Oshkosh Feedyard and the managing partner of the Jessen Family Limited Partnership.

On July 15, 2013, Jessen, on behalf of Oshkosh Feedyard, entered into an exclusive listing agreement with George Clift Enterprises (GCE), through GCE's agent, Richard Bretz, for the sale of Oshkosh Feedyard.

### 1. Exclusive Listing Agreement

Under the agreement, the listing price was $4.5 million. The agreement was to be in effect for a period of time beginning on the effective date of the contract and continuing uninterrupted for 12 months. The agreement provided for both a "listing fee" and a "[b]rokerage [f]ee."

The listing fee was $4,000 payable immediately upon execution of the agreement, and there is no dispute that it was paid.

- 780 -

Nebraska Supreme Court Advance Sheets
306 Nebraska Reports
GEORGE CLIFT ENTERS. v. OSHKOSH FEEDYARD CORP.
Cite as 306 Neb. 775

The brokerage fee was 4.5 percent of the sales price to be earned and was payable when the following conditions were met:

    1. The sale of the property closes.

    2. Owner defaults after Broker produces a ready, willing and able buyer agreeable to Owner's price and terms as stated herein or after signing by Owner and Buyer any letter, memorandum, or contract that contains agreements to convey the Property. The sale price under this clause shall be the lesser of the listing price or the sale price stated in any signed documents.

    3. Buyer defaults and Owner retains any earnest money. The commission fee shall be calculated on the amount of earnest money received by the Owner.

The agreement also contained a protection period clause as follows:

    **PROTECTION PERIOD:** Owner agrees to pay the Brokerage Fee under the same terms and conditions specified above if, within two months after termination of this agreement, the Property should be under contract, sold, transferred, exchanged or conveyed to: (1) any person(s) or entity to whom Broker submitted the Property and of whom Owner had actual knowledge and/or (2) any person(s) or entity to whom Broker submitted the Property and whose name shall be included on a list delivered to Owner by Broker within thirty (30) days after termination hereof or (3) any person(s) or entity who contacted Owner concerning the sale of the Property or to whom Owner submitted the Property for sale during the term hereof and whose name Owner either refused or failed to refer to Broker. Owner agrees to refer all prospective buyers to Broker and agrees not to negotiate with such prospective buyers.

A confidentiality provision stated, "Broker will perform its consulting role in a non-confidential manner, but will enter into a valid Confidentiality Agreement with interested parties

- 781 -

Nebraska Supreme Court Advance Sheets
306 Nebraska Reports
GEORGE CLIFT ENTERS. v. OSHKOSH FEEDYARD CORP.
Cite as 306 Neb. 775

prior to distributing financial or other proprietary information provided by Owner." The agreement was "the entire agreement of the Parties regarding the Property and may not be changed except by written agreement signed by the Parties."

## 2. Purchasers

In early 2014, Jeff Betley, Marc Braun, and Bill Matzke, all Wisconsin residents, discussed their mutual interest in purchasing a feedyard in the Kansas, Nebraska, or Colorado region. In April 2014, Betley contacted Bretz, informing him that Betley, Braun, and Matzke were looking for a feedyard for their dairy heifers.

Meanwhile, Jessen had become discontented with Bretz' efforts at selling Oshkosh Feedyard. Bretz suggested to Betley several different feedyards that were for sale. Bretz mentioned Oshkosh Feedyard, but did not recommend it.

At the same time, a friend of Matzke's recommended Oshkosh Feedyard and told him to contact Jessen if he was interested. Matzke did so, and Jessen gave Betley, Braun, and Matzke a tour of the feedyard in May 2014. But Betley, Braun, and Matzke were clear that they were just getting started looking at different feedyards and were not yet in a position to make an offer. According to Jessen's uncontested averment, Jessen advised Bretz that he was communicating with Betley, Braun, and Matzke regarding a possible sale, and Bretz raised no objection.

In June 2014, Bretz was in contact with Braun by email, recommending a Kansas feedyard for them. In the email, Bretz also stated:

> Regarding the Oshkosh yard, there is nothing that would help more in resolving the owner's and my challenge over the exclusive listing than getting the yard sold. Please continue forward on that project as long as it is viable to you. The owner and I will deal with the listing agreement.

Braun averred, "Bretz went on to tell me that Betley, Matzke and I should continue our discussions about the sale

- 782 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
306 NEBRASKA REPORTS
GEORGE CLIFT ENTERS. v. OSHKOSH FEEDYARD CORP.
Cite as 306 Neb. 775

of . . . Oshkosh Feedyard with Jessen, and that Bretz and Jessen would work things out." No evidence was submitted disputing this statement.

Sometime in the summer of 2014, Betley, Braun, and Matzke decided to try to purchase Oshkosh Feedyard. They negotiated with Jessen and eventually formed Oshkosh Heifer Development LLC, with Jessen as a member, on August 12 for that purpose. After further negotiations, Oshkosh Heifer Development finalized a purchase agreement with Oshkosh Feedyard in December. It was not until December 12 that Oshkosh Heifer Development had adopted a corporate resolution authorizing Braun to execute the purchase agreement, promissory note, and deed of trust on its behalf for the purchase of Oshkosh Feedyard.

The listing period of the exclusive listing agreement had expired on July 15, 2014, and the protection period had expired on September 15.

## 3. 2014 Action

On August 18, 2014, GCE filed a complaint against Oshkosh Feedyard alleging that Oshkosh Feedyard had breached the listing agreement by not referring to GCE "one or more prospective buyer(s)" with whom Oshkosh Feedyard or its agents had contact and by "engaging in negotiation with any prospective buyer(s)." As damages for GCE's lost opportunity to contact such prospective buyers and negotiate with such prospective buyers, GCE sought the amount of a $202,500 commission, based on the list price, plus $20,000 allegedly expended by GCE in efforts to market the property. On July 17, 2017, the court dismissed the action without prejudice for lack of prosecution. The court noted that nothing had been filed with the court since December 2014 to indicate the matter was being actively pursued and that responses to discovery had been delayed for an extended period of time. The court elaborated that although GCE had engaged new counsel in the 2014 action, it still had not moved appreciably forward.

- 783 -

Nebraska Supreme Court Advance Sheets
306 Nebraska Reports
GEORGE CLIFT ENTERS. v. OSHKOSH FEEDYARD CORP.
Cite as 306 Neb. 775

## 4. September 2017 Complaint

On September 7, 2017, GCE filed a new complaint against Oshkosh Feedyard, Jessen, Betley, Braun, Matzke, and Oshkosh Heifer Development, alleging that pursuant to the terms of the exclusive listing agreement with Oshkosh Feedyard, it was entitled to a reasonable brokerage fee on the sale of the property. GCE alleged it had made a reasonable effort to market and procure a buyer for Oshkosh Feedyard. GCE alleged that Betley, Braun, and Matzke had sought information from GCE about Oshkosh Feedyard on or around April 29, 2014.

In its first cause of action, GCE alleged that Jessen, on behalf of Oshkosh Feedyard, breached the exclusive listing agreement by negotiating with and failing to refer to GCE prospective buyers during the period of the agreement, thereby causing GCE to lose the opportunity to contact and negotiate with prospective buyers. As in the prior 2014 action that was dismissed for lack of prosecution, GCE sought damages in the amount of $202,500, representing 4.5 percent of the list price of $4.5 million, plus $20,000 in expenses in advertising the listing.

In its second cause of action, GCE alleged a claim of tortious interference with a contract, business relationship, or expectation. In this regard, GCE alleged that all the defendants were aware of the exclusive listing agreement; that despite such knowledge, Betley, Braun, and Matzke contacted Jessen directly about purchasing Oshkosh Feedyard; and that Jessen failed to refer them to GCE. GCE alleged that Jessen, Betley, Braun, and Matzke improperly and unjustly colluded to arrange terms of a sale that deprived GCE of the brokerage fee owed to it under the exclusive listing agreement. GCE claimed the same amount of damages.

## 5. February 2018 Amended Complaint

On February 9, 2018, the court granted a motion by GCE's attorney to withdraw on the grounds that GCE had terminated representation by him and that GCE had found new counsel.

- 784 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
306 NEBRASKA REPORTS
GEORGE CLIFT ENTERS. v. OSHKOSH FEEDYARD CORP.
Cite as 306 Neb. 775

On February 28, 2018, GCE filed an amended complaint, setting forth in essence the same two causes of action. In the first cause of action, GCE alleged that Jessen and Oshkosh Feedyard breached the provisions of the exclusive listing agreement by (1) negotiating with prospective buyers and (2) failing to submit Betley, Braun, and Matzke to GCE as prospective buyers.

In the second cause of action, GCE alleged that the defendants all engaged in a conspiracy to tortiously interfere with GCE's contract, business relationship, or expectation. Specifically, GCE alleged Betley, Braun, and Matzke conspired with Jessen to "arrange terms of a sale which deprived Plaintiff of the Brokerage Fee owed to Plaintiff under the Exclusive Listing Agreement." The factual allegations of the amended complaint were similar to those of the original complaint, but GCE added the allegation that there was an in-person meeting between Jessen and Betley, Braun, and Matzke in March 2014, within the 12-month exclusivity period, to discuss the sale of Oshkosh Feedyard. GCE further alleged that Betley, Braun, and Matzke had begun placing their heifers in and operating Oshkosh Feedyard as early as August 2014, during the protection period. GCE sought $198,500 as damages, calculated as 4.5 percent of the alleged sale price of $4.5 million, less the $4,000 listing fee paid by Oshkosh Feedyard.

In their answers, the defendants denied the operative allegations of the amended complaint. They alleged that during the listing period, GCE knew of Betley, Braun, and Matzke's interest in the property and had discussions with them, and that thus, GCE could not be damaged by any lack of referral. The defendants alleged that at no time did GCE produce a buyer who was ready, able, and willing to consummate the purchase based on the terms of the listing agreement. Further, the property was not sold within the 2-month protection period. Betley, Braun, and Matzke alleged that Bretz, on behalf of GCE, had consented to and encouraged their discussions

- 785 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
306 NEBRASKA REPORTS
GEORGE CLIFT ENTERS. v. OSHKOSH FEEDYARD CORP.
Cite as 306 Neb. 775

with Jessen. All the defendants affirmatively alleged that the causes of action were frivolous and brought in bad faith.

## 6. DISCOVERY

Discovery disputes arose between the parties. Jessen and Oshkosh Feedyard had answered, partially answered, or agreed to provide at a later date answers to the majority of the first set of interrogatories and had provided or promised to supplement answers for the majority of the first requests for production of documents. But in March 2018, GCE moved to compel Jessen and Oshkosh Feedyard to supplement their answers to GCE's requests for admissions and interrogatories and its first set of requests for production of documents. Jessen and Oshkosh Feedyard had objected to all of the requests for admissions as vague, ambiguous, and irrelevant, noting that they could not answer any requests based upon the exclusive listing agreement when that agreement was not attached. The court sustained Jessen and Oshkosh Feedyard's objections to the requests for admissions but sustained in part GCE's motion to compel.

On May 14, 2018, GCE was still unable to identify in response to Jessen and Oshkosh Feedyard's requests for production of documents any document GCE intended to offer as evidence at trial or summary judgment. GCE stated it had "made no determination of what evidence will be offered" and would "supplement in accordance with the applicable state and local rules of discovery."

Certain supplemental answers were served on GCE in May 2018, but, on that same date, Jessen and Oshkosh Feedyard moved for a protection order in relation to one of the interrogatories, in order to protect proprietary information related to Oshkosh Feedyard's business practices, fees, and customers. GCE filed a motion to compel. The court resolved this dispute after approving a joint stipulation for a protective order in August 2018, and GCE eventually withdrew its motion to compel.

- 786 -

Nebraska Supreme Court Advance Sheets
306 Nebraska Reports
GEORGE CLIFT ENTERS. v. OSHKOSH FEEDYARD CORP.
Cite as 306 Neb. 775

In September 2018, Jessen and Oshkosh Feedyard moved the court to compel GCE to answer discovery, which motion the court later denied on the ground that it referred to the first complaint that was no longer operative. In October 2018, GCE moved for an order compelling Jessen and Oshkosh Feedyard to fully answer its second sets of written interrogatories and requests for production of documents and its third sets of requests for admissions and written interrogatories. GCE also requested sanctions. The court overruled Jessen and Oshkosh Feedyard's objections and required Jessen and Oshkosh Feedyard to answer GCE's second, third, and fourth sets of interrogatories, but it denied GCE's request for sanctions.

In December 2018, GCE asked for leave to issue a subpoena on a third party, Settje Agri Services & Engineering, Inc., seeking any and all documents pertaining to services rendered during 2014 to Oshkosh Feedyard, Jessen, Betley, Braun, Matzke, or Oshkosh Heifer Development. Jessen and Oshkosh Feedyard objected on the grounds that the information that would include feedyard design would furnish information to a competitor and was irrelevant to the alleged breach of the listing agreement. The court granted Jessen and Oshkosh Feedyard's motion for a protective order to the extent the communications requested were proprietary or protected by privilege.

On January 4, 2019, and again on February 27, GCE moved for an order to compel Betley, Braun, Matzke, and Oshkosh Heifer Development to fully answer its second sets of interrogatories and requests for production of documents, which had been sent in October 2018. While answers and responses had been served on GCE in January 2019, GCE asserted that two of the answers and responses were only partially responsive. The February 2019 motion was overruled in March.

### 7. Motion to Disqualify

Jessen and Oshkosh Feedyard had moved to disqualify GCE's attorneys in April 2018. The motion was based on the

- 787 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
306 NEBRASKA REPORTS
GEORGE CLIFT ENTERS. v. OSHKOSH FEEDYARD CORP.
Cite as 306 Neb. 775

fact that attorneys from the same law firm were representing Parker, Preistle, Gwen Jessen, the Jessen Family Limited Partnership, and Oshkosh Feedyard in a separate action against Jessen for self-dealing and other alleged breaches of his fiduciary duties. Oshkosh Feedyard, represented by Jessen and the attorneys in the action brought by GCE, alleged that GCE's attorneys had a conflict of interest. GCE alleged that Oshkosh Feedyard, through Jessen, lacked standing to raise any such conflict of interest.

Following an evidentiary hearing, the court denied the motion to disqualify. The court concluded that Jessen, as a general partner in the Jessen Family Limited Partnership, had standing to raise a concern on behalf of Oshkosh Feedyard pertaining to counsel's conflict of interest in representing Oshkosh Feedyard as a plaintiff in one action while suing Oshkosh Feedyard as a defendant in another action. But the court found there was no apparent conflict of interest, because if the plaintiffs are unsuccessful in either action, then Oshkosh Feedyard would suffer no loss.

### 8. MOTION FOR SUMMARY JUDGMENT AND MOTION FOR CONTINUANCE OF SUMMARY JUDGMENT HEARING

In two separate motions, the defendants moved, on January 15, 2019, for summary judgment. Thereafter, on January 28, 2019, GCE filed, for the first time, notices of depositions of Jessen, Betley, Braun, and two other individuals, to take place the end of May.

On March 1, 2019, GCE filed an opposition to the motions for summary judgment by the defendants or, in the alternative, a motion for a continuance of the summary judgment hearing. In its motion, GCE noted that "while written discovery in this case is substantially completed, there are still matters of written discovery which are incomplete," such as the documents GCE expected to receive from Settje Agri Services & Engineering. GCE also pointed out that depositions had not yet been conducted, asserting that the depositions were

- 788 -

Nebraska Supreme Court Advance Sheets
306 Nebraska Reports
GEORGE CLIFT ENTERS. v. OSHKOSH FEEDYARD CORP.
Cite as 306 Neb. 775

"absolutely essential, especially those of the Defendants." GCE asserted that depositions would afford GCE the best mechanism for exploring communications between the defendants pertaining to their plans and activities to purchase Oshkosh Feedyard during the listing or protection period of the exclusive agency agreement. GCE indicated that the delay in discovery had been due to disputes between the parties through which GCE had "been forced to file five motions to compel."

On March 19, 2019, the court heard the defendants' motions for summary judgment and took the matter under advisement. Following the hearing, the defendants moved for a protective order against the pending depositions for several reasons, including that the depositions would become moot if the court ruled in their favor on their motions for summary judgment.

At the summary judgment hearing, the defendants submitted affidavits as well as documentary evidence that they believed demonstrated a lack of any material issue of fact.

(a) Correspondence

Correspondence admitted at the summary judgment hearing demonstrated that Betley reached out to Bretz sometime before April 29, 2014, expressing an interest in purchasing a feedyard somewhere in the United States for heifers coming from Wisconsin and Michigan. Betley described that "[w]e should be in the 15,000 to 20,000 head range based on dairy heifer bunk space requirements" and that "If yard is smaller expansion should be a possibility."

Later that day, Betley requested from Bretz more information on a feedyard in Texas. In the evening of April 29, 2019, Bretz sent to Betley the book for the feedyard in Texas. Bretz asked Betley for more information in order to "put together a list of properties that might fit." According to Bretz, if heifers were coming from Wisconsin, "a Kansas or Nebraska yard may make more sense."

Around the same time, on April 22, 2014, there was correspondence between Dallas Kime and Matzke in which Kime

- 789 -

Nebraska Supreme Court Advance Sheets
306 Nebraska Reports
GEORGE CLIFT ENTERS. v. OSHKOSH FEEDYARD CORP.
Cite as 306 Neb. 775

sent Matzke information about Oshkosh Feedyard as a prospect and told Matzke to contact Jessen if he was interested. An email on April 23 reflects that Matzke contacted Jessen by telephone that day and that Matzke was interested in seeing the property.

On April 29, 2014, Jessen emailed Matzke telling him he had a verbal purchase offer on Oshkosh Feedyard, explaining, "Obviously I want to wait for you IF that might lead to a better offer to me, but likewise I don't want this offer to go away and no offer to be made by your group."

On May 1, 2014, Matzke responded to Jessen, thanking him for letting him know about the status of Oshkosh Feedyard but explaining, "We are just starting to explore our options after spending 2 years discussing this project." Matzke stated, "We are not in any position at this time to make any offers," as well as that Jessen should not hold off on accepting other offers he might receive.

However, Matzke offered to come look at Oshkosh Feedyard on May 3, 2014, since he was going to be in western Kansas that week looking at cattle. Subsequent correspondence reflects that Matzke and Jessen arranged for Jessen to show Oshkosh Feedyard to Matzke on May 10.

On May 10, 2014, Bretz wrote an email to Betley, apologizing for a "slow response." The email then proceeded to refer to several feedyards, other than Oshkosh Feedyard, which Bretz proposed would be "a fit." Bretz also attached the book on Oshkosh Feedyard, but "more to provoke thought than an outright suggestion." Bretz described Oshkosh Feedyard as "an older yard with a small feedmill [that] would be at the small end to handle the number of heifers you will grow."

In an email from Jessen to Betley and Braun on May 12, 2014, Jessen expressed that he enjoyed their visit and thanked Betley and Braun for "taking the time to look and consider." Jessen stated further:

> Please contact me with your questions as they come up. I was at the lot tonight for another showing. I feel that the time is right & a buyer will come forward. If the lot

- 790 -

Nebraska Supreme Court Advance Sheets
306 Nebraska Reports
GEORGE CLIFT ENTERS. v. OSHKOSH FEEDYARD CORP.
Cite as 306 Neb. 775

is right for you, please let me know your thoughts. I feel that your group would be good for Oshkosh Nebraska !

On June 20, 2014, Bretz emailed Braun. Bretz thanked Braun for signing a confidentiality agreement. Most of the email discussed a particular feedyard in Kansas, Pawnee Valley Feeders, as a good option for Betley, Braun, and Matzke's needs, as well as two other feedyards in Kansas that might be a good fit but which Bretz would not be able to look at personally until July 7. Bretz closed the email with a note on Oshkosh Feedyard:

> Regarding the Oshkosh yard, there is nothing that would help more in resolving the owner's and my challenge over the exclusive listing than getting the yard sold. Please continue forward on that project as long as it is viable to you. The owner and I will deal with the listing agreement.

Correspondence from Braun to Betley and Matzke on that same date appears to indicate that Braun was interested in the Pawnee Valley Feeders yard. Braun attached the book for Pawnee Valley Feeders in an email that said, "I signed a confi[dentiality] agreement and he stressed the importance of not discussing with anyone. Bill can you do some homework on the feed availability in this area? The lot looks awesome."

### (b) Matzke's Affidavit

Matzke in his affidavit averred that he had never heard of Jessen or Oshkosh Feedyard until sometime around April 22, 2014, when a friend, Kime, advised him that Oshkosh Feedyard was for sale and he contacted Jessen. On April 29, Jessen advised that he had another offer on the property. Betley, Braun, and Matzke visited the property on May 10. Matzke was aware that Betley was in contact with Bretz on their behalf regarding feedyards for sale as early as April 29.

In June 2014, Betley, Braun, and Matzke were still looking at various feedyards. Matzke averred that while they had signed confidentiality agreements related to several feedyards that they were considering, they had not signed any

- 791 -

Nebraska Supreme Court Advance Sheets
306 Nebraska Reports
GEORGE CLIFT ENTERS. v. OSHKOSH FEEDYARD CORP.
Cite as 306 Neb. 775

such agreement with Bretz, Jessen, or anyone else regarding Oshkosh Feedyard.

Matzke received a forwarded email on June 20, 2014, that Braun had received from Bretz. Matzke understood that GCE and Bretz had given him, Betley, and Braun consent to visit directly with Jessen in an attempt to purchase Oshkosh Feedyard. Matzke averred that he was unaware of any listing agreement between Bretz and Oshkosh Feedyard until June 20. He did not see a copy of the agreement until the lawsuit was filed 3 years later.

Matzke averred that sometime in the summer of 2014, Betley, Braun, and Matzke decided to try to purchase Oshkosh Feedyard and, in the course of discussions, came to an agreement to form a limited liability company that would include Jessen "to share the potential financial obligations and provide us with a local contact through Jessen for operational purposes." Thus, Oshkosh Heifer Development was formed on August 12. Matzke averred that Oshkosh Heifer Development did not finalize an agreement to purchase Oshkosh Feedyard until December.

Matzke averred that he had never spoken with Jessen about delaying the purchase or trying to deprive GCE of a commission and that he lacked any intent to damage GCE. Matzke averred that he, Betley, Braun, and Oshkosh Heifer Development had incurred legal fees and expenses of $14,877.50 in defending the lawsuit against them.

### (c) Braun's Affidavit

Braun's affidavit mirrored Matzke's. He averred that he had never heard of Jessen or Oshkosh Feedyard until Matzke advised him in early 2014 that Oshkosh Feedyard was for sale. He was aware that Betley was in contact with Bretz on his, Betley's, and Matzke's behalf regarding feedyards for sale as early as April 29. In June, he, Betley, and Matzke were still looking at various feedyards.

On or about June 20, 2014, Bretz called Braun, "advising [him] that [Bretz] had a listing agreement on . . . Oshkosh

- 792 -

Nebraska Supreme Court Advance Sheets
306 Nebraska Reports
GEORGE CLIFT ENTERS. v. OSHKOSH FEEDYARD CORP.
Cite as 306 Neb. 775

Feedyard, and that he had experienced numerous problems dealing with Jessen on the sale of that feedyard." Braun averred, "Bretz went on to tell me that Betley, Matzke and I should continue our discussions about the sale of . . . Oshkosh Feedyard with Jessen, and that Bretz and Jessen would work things out."

Braun averred that he, Betley, and Matzke did not decide to try to purchase Oshkosh Feedyard until the summer of 2014 and that they came to an agreement with Jessen to form a limited liability company also in the summer of 2014. Oshkosh Heifer Development did not finalize an agreement to purchase Oshkosh Feedyard until December 2014. Braun was not aware of a listing agreement between GCE and Oshkosh Feedyard until June 20, 2014, and he did not see the agreement until the lawsuit was filed 3 years later.

Braun understood that GCE and Bretz had given him, Betley, and Matzke consent to visit directly with Jessen in an attempt to purchase Oshkosh Feedyard. The first time Braun became aware that GCE had an objection of any kind to Jessen's selling Oshkosh Feedyard to Oshkosh Heifer Development was in October 2017. Braun averred that he never engaged in any discussion with Jessen about delaying the purchase or trying to deprive GCE or Bretz of a commission and that he never had such intent.

### (d) Betley's Affidavit

Betley's affidavit is nearly identical to the others. Betley averred that from May 7 to 13, 2014, he exchanged emails with Bretz wherein Bretz provided him with information on Oshkosh Feedyard. Betley averred that he had never spoken with Jessen about delaying the purchase or depriving GCE or Bretz of a commission and had never intended to damage either of them.

### (e) Jessen's Affidavit

Jessen averred that he had no contact with Betley, Braun, or Matzke about their purchasing Oshkosh Feedyard until

- 793 -

Nebraska Supreme Court Advance Sheets
306 Nebraska Reports
GEORGE CLIFT ENTERS. v. OSHKOSH FEEDYARD CORP.
Cite as 306 Neb. 775

April 2014, when Matzke contacted him. Before that contact, his "relationship with Bretz had deteriorated primarily because [he] felt that Bretz was doing a poor job of trying to sell [Oshkosh Feedyard]."

In April or May 2014, Jessen "advised Bretz that I was communicating with the other Defendants about a possible sale of [Oshkosh Feedyard] to them, and Bretz raised no objection or complaint about the communication at that time." Jessen also saw the email communication between Bretz and Braun. Jessen averred that Bretz "never complained to me about my direct contact with the other Defendants in an attempt to sell [Oshkosh Feedyard]."

Jessen averred that Bretz was "fully aware of the other defendants," noting that on August 14, 2014, Bretz provided Jessen with "at least two of the defendant[s'] names . . . on a list captioned 'Oshkosh Prospective Buyers.'" A document entitled "Oshkosh Prospective Buyers," dated July 15, 2013, through July 14, 2014, lists Betley and Braun.

Jessen averred that at no time did he discuss a delay in closing on Oshkosh Feedyard with Betley, Braun, or Matzke; attempt to persuade them regarding one; or take any other action that would have damaged GCE.

According to Jessen, at some point before the end of the listing agreement, he retained counsel on behalf of Oshkosh Feedyard. With about 3 weeks left of the agreement, Oshkosh Feedyard's counsel informed GCE's counsel that GCE should continue its pursuit of any buyers who would be ready, willing, and able to sign a purchase agreement for the full listing price before the end of the listing agreement on July 15, 2014.

The letter from Oshkosh Feedyard's counsel was received by GCE's counsel on the same date when Bretz sent the email that Betley, Braun, and Matzke understood to be encouraging them to negotiate directly with Jessen if they were interested in Oshkosh Feedyard. Jessen averred that GCE was never able to find a buyer ready, willing, and able to pay the full listing price or able to obtain any written or verbal offer from

- 794 -

Nebraska Supreme Court Advance Sheets
306 Nebraska Reports
GEORGE CLIFT ENTERS. v. OSHKOSH FEEDYARD CORP.
Cite as 306 Neb. 775

a potential purchaser during either the listing period or the protection period.

Jessen described that he became a member of Oshkosh Heifer Development "after the other Defendants and I determined that if they were going to purchase and operate [Oshkosh Feedyard], it would be beneficial to them to have a local contact since all of them lived in other states." Further, "[t]he closing on the sale of [Oshkosh Feedyard] did not occur until December of 2014; because not all of the details of the purchase or ongoing operations had been finalized until then." Jessen averred that the limited liability corporation was formed in August 2014 "so that the investors/members would have an entity to use to purchase [Oshkosh Feedyard] and conduct business in the event the numerous investors/members reached an agreement to proceed." Jessen explained that "[i]t took extensive time for many months after the termination of the listing agreement to determine investors/members and reach an agreement on the sale of [Oshkosh Feedyard]."

Jessen averred that this is the second time Oshkosh Feedyard has been sued by GCE on similar claims. The prior lawsuit was filed just 4 days after Bretz furnished Jessen with the prospective buyers list, and before the protection period had lapsed.

#### (f) Sterling Huff's Affidavit

Sterling Huff, attorney for Jessen and Oshkosh Feedyard, began representing Jessen and Oshkosh Feedyard before the expiration of the listing agreement. According to the pleadings, Jessen, on behalf of Oshkosh Feedyard, sought legal counsel in early May 2014. Attached to Huff's affidavit was correspondence between Huff and GCE's counsel at that time in which Huff explained that Jessen was unhappy with the amount of effort Bretz had put into advertising the $4.5 million listing, for which Oshkosh Feedyard had already paid a $4,000 upfront listing fee.

In correspondence in June 2014 between Huff and counsel at the time for GCE, Huff communicated:

- 795 -

Nebraska Supreme Court Advance Sheets
306 Nebraska Reports
GEORGE CLIFT ENTERS. v. OSHKOSH FEEDYARD CORP.
Cite as 306 Neb. 775

[I]t appears your client has 23 days left in its contract to make good on its hallowed promises and sell [Oshkosh] Feedyard. Since the contract states that "Owner . . . agrees to not negotiate with prospective buyers", I assume that your client's confidence is high that a buyer for the full listing price will be found within that time. I am certain a sale of that nature would make all sides of this equation quite happy.

Huff averred that to the best of his knowledge, this was the last communication between the parties before the lawsuit was filed in August 2014. GCE's counsel never communicated to Huff that there were any prospective buyers willing to pay the full listing price or less than the full listing price and never communicated there were any tentative purchase agreements, verbal offers, or "any offers on the property whatsoever."

### (g) Oshkosh Heifer Development Documents and Purchase Agreement

The certificate of organization for Oshkosh Heifer Development reflects that it was formed on August 7, 2014. And it was not until December 12 that Oshkosh Heifer Development adopted a corporate resolution authorizing Braun to execute the purchase agreement, promissory note, and deed of trust on its behalf for the purchase of Oshkosh Feedyard.

The purchase agreement was entered into on December 15, 2014, between Oshkosh Heifer Development as the buyer and Oshkosh Feedyard as the seller. The selling price was $2.5 million. The purchase agreement arranged a $600,000 downpayment and the remaining balance to be paid in monthly payments at an interest rate of 6 percent per annum, with a balloon payment due on August 2, 2024, if not previously paid off.

In their answers to interrogatories, the defendants stated that they did not know what the phrase "early occupancy" referred to in a risk of loss provision of the purchase agreement. The provision in question provided in full:

Risk of loss is on the Seller until the date and time of early occupancy by BUYER. SELLER shall keep the

- 796 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
306 NEBRASKA REPORTS
GEORGE CLIFT ENTERS. v. OSHKOSH FEEDYARD CORP.
Cite as 306 Neb. 775

property adequately insured until said time. In the event of damage to the property from any source, including but not limited to theft, vandalism, hail, wind, fire, rain, flood, snow, weather or other Act of God etc that results in a 5% or more diminution in value, then the BUYER can vacate this contract in its entirety in Buyer's sole and exclusive discretion by providing written notice to Seller. SELLER shall have no causes of action nor further remedies against BUYER. BUYER shall keep insurance on the property from the date of early occupancy forward and assume all risk of loss.

The promissory note was signed on December 15, 2014.

A six-page trust deed was signed on December 12, 2014, with Oshkosh Heifer Development as the borrower, Oshkosh Feedyard as the beneficiary, and Huff as the trustee. In answers to interrogatories by GCE, the defendants stated that they did not know why there was language in the trust deed referring to a "deferred purchase money note," explaining that the trust deed was given to secure the promissory note and sums described therein. That provision states in full:

PURCHASE MONEY SECURITY: This Trust Deed is given to secure payment of a deferred purchase money note, by BORROWER to BENEFICIARY to pay the balance of the purchase price of all or a part of the Trust Property, and is a continuation of the original lien of the seller of said Trust Property. This Deed of Trust shall also apply to any future advances made by Beneficiary to Borrower.

In their answers to interrogatories, the defendants stated that no cattle owned by Oshkosh Heifer Development were placed in Oshkosh Feedyard in 2014.

### (h) James Korth's Affidavit

The only evidence submitted by GCE in opposition to summary judgment was an affidavit by James Korth, GCE's attorney. Korth averred that while the written discovery in the case was largely complete, there were still some matters

- 797 -

Nebraska Supreme Court Advance Sheets
306 Nebraska Reports
GEORGE CLIFT ENTERS. v. OSHKOSH FEEDYARD CORP.
Cite as 306 Neb. 775

of written discovery to be completed, which he listed as
(1) the receipt of documents from Settje Agri Services &
Engineering and (2) a recently arisen dispute between the
parties subject to a motion to compel by GCE set for hearing
on March 4, 2019.

Korth averred, further, that the depositions noticed for May
28 and 29, 2019, were "absolutely essential, especially those
of the Defendants." Korth elaborated that through deposi-
tions, GCE could explore the activities of and communica-
tions between the defendants during the listing contract period
pertaining to their plans to purchase Oshkosh Feedyard, which
may reveal material issues pertaining to whether they colluded
to purchase Oshkosh Feedyard after the listing period had
elapsed. Korth noted the defendants stated in written inter-
rogatories that they had no knowledge of what the references
in their purchase agreement to an "early occupancy" date
were and that they did not know why there was language in
the trust deed with power of sale referring to a deferred pur-
chase money note—both provisions apparently being suspi-
cious to GCE.

With regard to the delay in taking the depositions, Korth
averred the matter had been "discussed between counsel in
August 2017 . . . and then held in abeyance as a result of then
pending issues regarding written discovery." Korth attached
a copy of communication in which, on August 1, 2018, the
defendants' counsel wrote to Korth that if review of discovery
responses did not change GCE's position, then the defendants
"would like to get depositions schedule[d] right away," as
the defendants "are going to run into some time constraints
due to the nature of agriculture starting the first and middle
part of September, and if you want their depositions, it will
either need to be sometime during August or late October or
November." Korth responded on August 17, asking about the
defendants' availability during the week of August 27 through
31, September 4, or the morning of September 5. The defend-
ants' counsel responded on August 20 that the defendants

- 798 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
306 NEBRASKA REPORTS
GEORGE CLIFT ENTERS. v. OSHKOSH FEEDYARD CORP.
Cite as 306 Neb. 775

would be available on September 4 and that counsel would like to take the depositions of Bretz and George Clift at that time if possible. Korth responded on August 21, "We are now looking at the late October or November timeframe for depositions." Korth explained, "It appears there are some loose ends re: pending written discovery requests which make it impracticable to take depositions at this point; that, and the fact that my wife is due September 6th, which complicates matters for me on a personal level." No further correspondence was submitted.

### 9. ORDER DENYING CONTINUANCE AND GRANTING SUMMARY JUDGMENT

On April 23, 2019, the court granted the defendants' motions for summary judgment. The court overruled GCE's objection to the motion for summary judgment as premature, noting that the case had been pending for over 18 months and had previously been brought in 2014.

The court found no issue of fact that GCE failed to produce a ready, willing, and able buyer within the listing period. Further, there was no issue of fact that Bretz was aware of the existence of Betley and Braun as prospective buyers during the listing period. There was no issue of fact that there were no discussions between Jessen and Betley, Braun, and Matzke during the listing period regarding an offer to purchase. Discussions of such a nature began during the protection period, but the property was not "under contract, sold, transferred, exchanged or conveyed" before September 15, 2014, as would be required to be covered by the protection period. As such, there was no genuine issue of material fact under the first cause of action in that Jessen and Oshkosh Feedyard did not breach the exclusive listing agreement.

Concerning the second cause of action for tortious interference as against Betley, Braun, and Matzke, the court found no material issue of fact that Betley, Braun, and Matzke lacked any knowledge of the exclusive listing agreement and,

- 799 -

Nebraska Supreme Court Advance Sheets
306 Nebraska Reports
GEORGE CLIFT ENTERS. v. OSHKOSH FEEDYARD CORP.
Cite as 306 Neb. 775

furthermore, that GCE, through Bretz, affirmatively encouraged Betley, Braun, and Matzke to engage in negotiations directly with Jessen for the sale of Oshkosh Feedyard. And the court found no material issue of fact that Jessen and Oshkosh Feedyard had not committed an unjustified intentional act of interference. It was undisputed that no efforts were made by Jessen and Oshkosh Feedyard to "drag the sale out until after the expiration of the protection period."

### 10. Attorney Fees

The defendants had moved for attorney fees on the ground that the claims against them were frivolous. The court found that the action was frivolous. The court reasoned that "after years of litigation and numerous discovery disputes and resolutions, the Plaintiff cannot demonstrate sufficient evidence to survive summary judgment." Further, "it is apparent in the record that the Plaintiff's own agent was aware of the activities it then complained of and that he, as the Plaintiff's agent, consented to such activities." Finally, the court reasoned, "Discovery demonstrated that the contractual and tortious claims being made by the Plaintiff were not supported in the evidence and yet the Plaintiff persisted in its recovery efforts."

The court ordered GCE to pay attorney fees to Betley, Braun, and Matzke in the amount of $21,774.78 and to Jessen and Oshkosh Feedyard in the amount of $25,657.67.

GCE appeals.

### III. ASSIGNMENTS OF ERROR

GCE assigns that the district court erred (1) in sustaining the motions for summary judgment or, alternatively, in failing to sustain GCE's motion for a continuance of the hearing on summary judgment and (2) in sustaining the defendants' motions for attorney fees.

Jessen and Oshkosh Feedyard cross-appeal, assigning that the district court erred by (1) not sustaining their motion to disqualify and (2) failing to make the award of attorney fees joint and several against GCE's attorneys.

- 800 -

Nebraska Supreme Court Advance Sheets
306 Nebraska Reports
GEORGE CLIFT ENTERS. v. OSHKOSH FEEDYARD CORP.
Cite as 306 Neb. 775

## IV. STANDARD OF REVIEW

[1] A trial court's grant or denial of a continuance is within the discretion of the trial court, whose ruling will not be disturbed on appeal in the absence of an abuse of discretion.[1]

[2] On appeal, an appellate court will uphold a lower court's decision allowing or disallowing attorney fees for frivolous or bad faith litigation in the absence of an abuse of discretion.[2]

[3] Mootness is a justiciability question that an appellate court determines as a matter of law when it does not involve a factual dispute.[3]

## V. ANALYSIS

GCE argues that we should reverse the order of summary judgment because the district court held the summary judgment hearing before GCE had conducted depositions. Alternatively, GCE asserts that the district court abused its discretion in finding GCE's action frivolous and awarding attorney fees and costs against it. Jessen and Oshkosh Feedyard cross-appeal, asserting that the district court erred by denying their motion to disqualify GCE's counsel and by failing to order GCE's counsel jointly and severally liable for the attorney fees and costs awarded.

### 1. Failure to Order Continuance to Take Depositions

[4] Generally, the control of discovery is a matter for judicial discretion.[4] A trial court's grant or denial of a continuance is likewise within the discretion of the trial court, whose

---

1 See *Lombardo v. Sedlacek*, 299 Neb. 400, 908 N.W.2d 630 (2018). See, also, *Gaytan v. Wal-Mart*, 289 Neb. 49, 853 N.W.2d 181 (2014); *Fo Ge Investments v. First American Title*, 27 Neb. App. 671, 935 N.W.2d 245 (2019).

2 *Korth v. Luther*, 304 Neb. 450, 935 N.W.2d 220 (2019).

3 See *State v. York*, 278 Neb. 306, 770 N.W.2d 614 (2009).

4 *Lombardo v. Sedlacek, supra* note 1.

- 801 -

Nebraska Supreme Court Advance Sheets
306 Nebraska Reports
GEORGE CLIFT ENTERS. v. OSHKOSH FEEDYARD CORP.
Cite as 306 Neb. 775

ruling will not be disturbed on appeal in the absence of an abuse of discretion.[5]

[5] Neb. Rev. Stat. § 25-1335 (Reissue 2016) provides a safeguard against an improvident or premature grant of summary judgment.[6] It provides:

> Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

[6] As a prerequisite for a continuance, additional time, or other relief, a party is required to submit an affidavit stating a reasonable excuse or good cause for the party's inability to oppose a summary judgment motion.[7] The affidavit of good cause should specifically identify the relevant information that will be obtained with additional time and indicate some basis for the conclusion that the sought information actually exists.[8]

[7] In ruling on a request for a continuance or additional time in which to respond to a motion for summary judgment, a court may consider the complexity of the lawsuit, the complications encountered in litigation, and the availability of evidence justifying opposition to the motion.[9] The court may also consider whether the party has been dilatory in completing discovery and preparing for trial.[10]

---

[5] *Lombardo v. Sedlacek, supra* note 1. See, also, *Gaytan v. Wal-Mart, supra* note 1; *Fo Ge Investments v. First American Title, supra* note 1.

[6] *Ronald J. Palagi, P.C. v. Prospect Funding Holdings*, 302 Neb. 769, 925 N.W.2d 344 (2019); *Lombardo v. Sedlacek, supra* note 1.

[7] See *Ronald J. Palagi, P.C. v. Prospect Funding Holdings, supra* note 6.

[8] See, *id.*; *Lombardo v. Sedlacek, supra* note 1.

[9] *Gaytan v. Wal-Mart, supra* note 1; *Fo Ge Investments v. First American Title, supra* note 1.

[10] *Gaytan v. Wal-Mart, supra* note 1.

- 802 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
306 NEBRASKA REPORTS
GEORGE CLIFT ENTERS. v. OSHKOSH FEEDYARD CORP.
Cite as 306 Neb. 775

The district court did not abuse its discretion in implicitly determining that GCE had been dilatory in failing to conduct depositions sooner. Despite the fact that this was the second action making the same allegations against Jessen and Oshkosh Feedyard as to an alleged breach of the exclusive listing agreement, January 28, 2019, was apparently the first time GCE took decisive steps to depose Jessen in either action. GCE took steps to depose the other defendants and nonparty Settje Agri Services & Engineering for the first time on that same date.

At that point, it had been approximately 18 months since the inception of this second lawsuit. Eight months after filing this action, GCE had been unable to identify in response to Jessen and Oshkosh Feedyard's requests for production of documents any document whatsoever that GCE intended to offer as evidence in support of its causes of action at trial or in a summary judgment hearing. This was after the first action had continued for almost 3 years before the court dismissed it for lack of prosecution. We have held that the time that a similar, prior case was pending without a request for depositions is relevant to a district court's determination of whether the party opposing summary judgment has had an adequate opportunity for discovery.[11]

The only explanation for good cause stated in GCE's motion was to blame the delay on the defendants' failure to respond to all written discovery requests, for which GCE had "been forced to file five motions to compel." In the affidavit submitted by Korth on GCE's behalf, he outlined correspondence which showed the defendants made themselves available for depositions in August, October, or November 2018. But that correspondence also demonstrated that GCE put the depositions off until October or November due in part to "pending written discovery requests" that GCE thought made "it impracticable to take depositions" earlier. And the depositions never took place in October or November.

---

[11] See *id.*

- 803 -

Nebraska Supreme Court Advance Sheets
306 Nebraska Reports
GEORGE CLIFT ENTERS. v. OSHKOSH FEEDYARD CORP.
Cite as 306 Neb. 775

While it is clear that written discovery was not completed to GCE's satisfaction before the defendants' motions for summary judgment, GCE did not explain why it could not effectively conduct its depositions without every piece of written discovery it wished to have. Further, not every motion by GCE to compel was granted. The district court was in the best position to determine to what extent the defendants were being unreasonable in their discovery responses and to what extent the lack of any written discovery interfered with GCE's ability to conduct depositions. We find no abuse of discretion in the district court's judgment.

Having determined that the district court did not prematurely address the defendants' motions for summary judgment, we turn to the merits of GCE's case and whether GCE's action was frivolous.

## 2. GCE's Causes of Action

[8] GCE's argument relating to the court's alleged error in ordering summary judgment rests entirely on its claim that the court held the summary judgment hearing prematurely before GCE had conducted depositions, a claim which we have already explained lacks merit. The only statement in the argument section in GCE's brief asserting that there was a material issue of fact presented at the summary judgment hearing was GCE's conclusory statement that "it is fairly evident that material factual issues remained at the time the Appellees filed their respective motions for summary judgment."[12] To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error.[13] The conclusory statement that it is "fairly evident" there were material issues of fact was insufficient to present a specific argument.[14] GCE did not support

---

[12] Brief for appellant at 20.

[13] *Carlson v. Allianz Versicherungs-AG*, 287 Neb. 628, 844 N.W.2d 264 (2014).

[14] Brief for appellant at 20.

- 804 -

Nebraska Supreme Court Advance Sheets
306 Nebraska Reports
GEORGE CLIFT ENTERS. v. OSHKOSH FEEDYARD CORP.
Cite as 306 Neb. 775

this conclusion by directing this court in the argument section of its brief to any material fact in the record in dispute.[15] Nevertheless, in order to address GCE's assignment of error regarding the court's award of attorney fees for maintaining a frivolous action, we must examine the evidence in light of the law governing GCE's claims.

#### (a) Procuring Ready, Willing, and Able Buyer During Listing Period

[9] As the district court noted, there was never any dispute that GCE was not entitled to a commission under the exclusive listing agreement for performing the condition of producing a ready, willing, and able buyer during the listing period. A broker employed for a definite time to effect a sale of property must perform whatever obligations the contract imposes upon the broker within the time limited.[16] If the broker does thus perform such obligations, the broker is entitled to the commission.[17] If the broker fails to perform within the time, the broker cannot recover the commission.[18]

[10] The exclusive listing agreement between GCE and Oshkosh Feedyard referred to the commission's being earned and payable either after a sale within the periods specified; after GCE produced a ready, willing, and able buyer agreeable to Oshkosh Feedyard's price and terms as stated in the listing agreement; or after signing by Oshkosh Feedyard and a buyer of a letter, memorandum, or contract that contained agreements to convey the property. Ordinarily, a real estate broker who, for a commission, undertakes to sell land on certain terms and within a specified period is not entitled to compensation for his or her services unless he or she produces a purchaser within

---

[15] See *Hauptman, O'Brien v. Turco*, 277 Neb. 604, 764 N.W.2d 393 (2009).

[16] Annot., 26 A.L.R. 784 (1923).

[17] *Id.*

[18] *Id.*

- 805 -

Nebraska Supreme Court Advance Sheets
306 Nebraska Reports
GEORGE CLIFT ENTERS. v. OSHKOSH FEEDYARD CORP.
Cite as 306 Neb. 775

the time limit who is ready, willing, and able to buy upon the terms prescribed.[19] When a broker is engaged by an owner of property to find a purchaser, the broker earns the commission when (1) the broker produces a purchaser ready, willing, and able to buy on the terms fixed by the owner; (2) the purchaser enters into a binding contract with the owner to do so; and (3) the purchaser completes the transaction by closing the title in accordance with the provisions of the contract.[20]

[11,12] However, so long as the contract does not otherwise provide, generally the final act of closing a sale within the listing period is not a condition precedent to a broker's right to a commission—if the broker has secured a binding contract of sale and is not at fault for the fact that the contract is never carried out.[21] The right to compensation based on the broker's production of a purchaser ready, willing, and able to buy upon terms specified by the principal or satisfactory to him or her is not impaired by the subsequent inability or unwillingness of the owner to consummate the sale on the terms prescribed.[22] On the other hand, in a listing agreement contemplating the negotiation of terms, a commission is not earned by the broker until an agreement upon the terms is reached between the buyer and seller.[23]

Thus, we have held that where a real estate broker obtains a purchaser for real estate while his brokerage contract is in full force and effect and no sale is made during the existence of the agreement, but the sale is made thereafter by the owner to the person produced by the agent and on "substantially the same terms" previously offered through the agent's efforts, the broker is entitled to a commission for making the

---

[19] *McCully, Inc. v. Baccaro Ranch*, 284 Neb. 160, 816 N.W.2d 728 (2012).

[20] *Dworak v. Michals*, 211 Neb. 716, 320 N.W.2d 485 (1982).

[21] See 12 C.J.S. *Brokers* § 225 (2004).

[22] See *Wisnieski v. Coufal*, 188 Neb. 200, 195 N.W.2d 750 (1972).

[23] See 12 C.J.S., *supra* note 21.

- 806 -

Nebraska Supreme Court Advance Sheets
306 Nebraska Reports
GEORGE CLIFT ENTERS. v. OSHKOSH FEEDYARD CORP.
Cite as 306 Neb. 775

sale.[24] Conversely, we have held that a broker is not entitled to a commission where the broker obtains a purchaser for real estate but no sale is made during the existence of the agreement and the sale is later made by the owner to the same purchaser but on terms that are not substantially the same offered through the agent's efforts.[25]

In *McCully, Inc. v. Baccaro Ranch*,[26] we accordingly held that the commission was due despite the fact that the actual closing took place after both the listing period and protection period, because the agent had found a buyer who had satisfied the condition of the listing agreement as being ready, willing, and able to purchase the property at terms acceptable to the seller within the listing period. The negotiations had been completed within the listing period, and the buyer testified he was ready to exchange based on the proposal signed during that listing period. The purchase agreement signed after the listing and protection periods was the exact same proposal signed by the buyer within the listing period, but with the proposal date altered to a date closer to the actual closing.[27]

In contrast, in *Coldwell Banker Town & Country Realty v. Johnson*,[28] we held that the agent was not entitled to a commission when the buyers and sellers entered into direct negotiations mere days after the expiration of the listing agreement and eventually executed the purchase. We explained that it did not matter that the buyers, within the listing period, had negotiated with the agent for the purchase of the same property and had made an offer on the property, because the sellers did not accept the offer then made. The purchase was

---

[24] See *Byron Reed Co., Inc. v. Majers Market Research Co., Inc.*, 201 Neb. 67, 71, 266 N.W.2d 213, 215 (1978).

[25] *Huston Co. v. Mooney*, 190 Neb. 242, 207 N.W.2d 525 (1973).

[26] *McCully, Inc., v. Baccaro Ranch, supra* note 19.

[27] See *id.* See, also, *Huston Co. v. Mooney, supra* note 25.

[28] *Coldwell Banker Town & Country Realty v. Johnson*, 249 Neb. 523, 544 N.W.2d 360 (1996).

- 807 -

Nebraska Supreme Court Advance Sheets
306 Nebraska Reports
GEORGE CLIFT ENTERS. v. OSHKOSH FEEDYARD CORP.
Cite as 306 Neb. 775

later effectuated under terms different from the terms of the buyers' first offer, during the listing period. In other words, we explained, the terms under which the sale took place were reached through the sellers', not the agent's, efforts.[29]

GCE did not allege it had obtained within the listing period a buyer who was ready, willing, and able to purchase Oshkosh Feedyard either at the listing price or at a price and on terms agreeable at that time to its owner. The 12-month listing period expired on July 15, 2014. There was no issue of fact that in May 2014, Betley, Braun, and Matzke were just starting to explore numerous feedyard options and stated to Jessen that they were in no position to make any offers. They were still considering several different feedyards in June 2014. Unlike the buyers in *Coldwell Banker Town & Country Realty*, Betley, Braun, and Matzke never even made an offer during the listing period—let alone an offer at the listing price or at a different price and on terms Oshkosh Feedyard was willing to accept. Thus, this case does not present a question of whether the agreement eventually reached was substantially the same as that procured by the broker.

[13] When the broker has failed to perform the condition upon which he or she was to be paid, there is an end to the contract; all contractual obligations of the owner toward the broker are terminated and the parties stand as if a contract had never been made.[30] The market for the sale of the owner's property is not circumscribed by the fact that some or all available purchasers have theretofore been approached by the broker.[31]

(b) Protection, Extension, or Safety Periods

While the exclusive listing agreement, like many listing agreements, had a protection period clause, GCE also never asserted that it was owed a commission because, pursuant to

---

[29] See *id.* See, also, *Huston Co. v. Mooney, supra* note 25.

[30] *Loxley v. Studebacker*, 75 N.J.L. 599, 68 A. 98 (1907).

[31] See *id.*

- 808 -

Nebraska Supreme Court Advance Sheets
306 Nebraska Reports
GEORGE CLIFT ENTERS. v. OSHKOSH FEEDYARD CORP.
Cite as 306 Neb. 775

the terms of the protection period clause of the agreement, Oshkosh Feedyard was under contract, sold, transferred, exchanged, or conveyed during the protection period to any person to whom GCE submitted the property.

[14,15] Clauses in exclusive listing agreements setting forth a protection, extension, or safety period after the listing period are strictly construed as setting the limits of the time period in which a sale must take place for a commission to be recoverable.[32] These clauses are meant to protect the broker from losing a commission earned during the listing period due to evasive conduct of the buyer and seller.[33]

The purpose of the protection period clause is to protect the broker even though the broker is not technically the procuring cause for the sale, but whose activities alerted the prospective buyer to the availability of the property for sale and the seller was able to conclude the sale to the buyer that he or she would not have been able to do if the broker's efforts had not alerted the buyer.[34] They are intended to protect the broker from a defrauding vendor who waits until just after the expiration of the initial listing period before selling to a purchaser with whom the broker has previously conducted negotiations.[35]

Thus, a claim that a seller in bad faith during the protection period delayed a sale until after expiration of the protection period is somewhat different from a claim that a seller in bad faith during a listing period purposefully delayed a sale until after the listing period. The protection period is precisely

---

[32] See *Kenney v. Clark*, 120 Ga. App. 16, 169 S.E.2d 357 (1969); *Thayer v. Damiano*, 9 Wash. App. 207, 511 P.2d 84 (1973).

[33] See 2 Harry D. Miller & Marvin B. Starr, California Real Estate § 5:51 (4th ed. 2015). See, also, e.g., *Harkey v. Gahagan*, 338 So. 2d 133 (La. App. 1976).

[34] See Miller & Starr, *supra* note 33. See, also, e.g., *Mellos v. Silverman*, 367 So. 2d 1369 (Ala. 1979).

[35] D. Barlow Burke, Jr., Law of Real Estate Brokers § 4.03 (4th ed. 2020).

- 809 -

Nebraska Supreme Court Advance Sheets
306 Nebraska Reports
GEORGE CLIFT ENTERS. v. OSHKOSH FEEDYARD CORP.
Cite as 306 Neb. 775

that—a protection from bad faith during the listing period without having to prove such tortious intent. And the seller's obligations during such protection period are accordingly more limited than those present during the listing period. As one court noted, if a broker wishes to retain the right to earn a commission on sales for which it was the procuring cause even though completed after the expiration of the extension period, the broker, as drafter of the agreement, can use the appropriate language to effectuate that intent in the agreement.[36]

It was undisputed that no contract, sale, transfer, exchange, or conveyance of Oshkosh Feedyard occurred during the protection period to anyone.

### (c) Duty to Refer and Refrain
### From Negotiating

Nevertheless, GCE asserts that a sale would have occurred during the protection period but for the defendants' allegedly tortious conduct. In its first cause of action, GCE claimed Jessen and Oshkosh Feedyard breached the provision of the last sentence of the protection period clause, which states: "Owner agrees to refer all prospective buyers to Broker and agrees not to negotiate with such prospective buyers." In its operative complaint, GCE asserted that it was owed the 4.5-percent commission because Jessen and Oshkosh Feedyard breached this promise of the exclusive listing agreement, thereby depriving GCE of its "opportunity to contact and negotiate with prospective buyer(s), known to Defendants JESSEN and [Oshkosh Feedyard]."

But, as the district court pointed out, it was undisputed that GCE knew of Betley and Braun and in fact encouraged them to negotiate directly with Jessen. And GCE, through its agent Bretz, was obviously aware of this fact before the present

---

[36] See *Leadership Real Estate, Inc. v. Harper*, 271 N.J. Super. 152, 638 A.2d 173 (1993).

- 810 -

Nebraska Supreme Court Advance Sheets
306 Nebraska Reports
GEORGE CLIFT ENTERS. v. OSHKOSH FEEDYARD CORP.
Cite as 306 Neb. 775

and the previous legal actions were commenced. Bretz had communicated to Braun, during the 12-month listing period, "Please continue forward on that project as long as it is viable to you. The owner and I will deal with the listing agreement." In a telephone conversation with Braun around the same time, Bretz told Braun that he, Betley, and Matzke "should continue [their] discussions about the sale of . . . Oshkosh Feedyard with Jessen, and that Bretz and Jessen would work things out."

[16] A written contract may be waived in whole or in part, either directly or inferentially, and the waiver may be proved by express declarations manifesting the intent not to claim the advantage, or by so neglecting and failing to act as to induce the belief that it was the intention to waive.[37] It is clear that GCE waived the obligation upon which it based its first cause of action against Jessen and Oshkosh Feedyard. Bretz, on behalf of GCE, apparently did so in the hope that direct communications with Jessen would lead to Betley's and Braun's becoming ready, willing, and able buyers on terms agreeable to Jessen before expiration of the protection period, thereby allowing GCE to claim a commission even though Jessen, rather than Bretz, would have been the procuring cause. When Jessen failed to reach an agreement within the protection period with Betley, Braun, and Matzke as to the price and terms of a sale of Oshkosh Feedyard, GCE sued Jessen and Oshkosh Feedyard for breaching the very provision it had waived in hopes of gaining an advantage.

[17-19] We also note that even if not waived, any claim of a breach of Oshkosh Feedyard's obligations under the protection period clause is subject to the general requirement that a plaintiff in a breach of contract action must prove that the breach was the proximate cause of the damages claimed. It is a basic concept that in any damage action for breach of contract, the claimant must prove that the breach of contract complained of

---

[37] *Pearce v. ELIC Corp.*, 213 Neb. 193, 329 N.W.2d 74 (1982).

- 811 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
306 NEBRASKA REPORTS
GEORGE CLIFT ENTERS. v. OSHKOSH FEEDYARD CORP.
Cite as 306 Neb. 775

was the proximate cause of the alleged damages.[38] There must be a causal relationship between the damages asserted and the breach relied upon.[39] Proof which leaves this issue in the realm of speculation and conjecture is insufficient to support a judgment.[40]

The failure to refer buyers to GCE could not be the proximate cause of any damages if GCE was actually aware of the buyers during the listing period and had direct contact with at least two of them. Moreover, after approximately 4½ years of litigation in two actions, GCE still failed to produce any evidence supporting a reasonable inference that Jessen's direct negotiations with Betley, Braun, and Matzke were the proximate cause of GCE's failure to produce a buyer who was ready, willing, and able to purchase Oshkosh Feedyard within the listing period for the listing price or at another price and upon terms agreeable to Oshkosh Feedyard or the proximate cause of Oshkosh Feedyard's failure within 2 months of the expiration of the listing agreement to be under contract, sold, transferred, or conveyed to a person submitted by GCE per the terms of the protection period clause.

All the defendants averred that they did not reach an agreement as to the terms of the purchase of Oshkosh Feedyard until December 2014. In fact, even viewing the evidence in the light most favorable to GCE, it appears that at no point during the 12-month listing period or the 2-month protection period following did the parties come close to reaching an accord as to the price and terms of a purchase. Only in August 2014 did Jessen, in his individual capacity, reach an agreement with Betley, Braun, and Matzke to join together in forming a

---

[38] *Lange Indus. v. Hallam Grain Co.*, 244 Neb. 465, 507 N.W.2d 465 (1993). See, also, e.g., *Sack Bros. v. Tri-Valley Co-op*, 260 Neb. 312, 616 N.W.2d 786 (2000).

[39] *Id.*

[40] *Id.* See, also, e.g., *Bedore v. Ranch Oil Co.*, 282 Neb. 553, 805 N.W.2d 68 (2011).

- 812 -

Nebraska Supreme Court Advance Sheets
306 Nebraska Reports
GEORGE CLIFT ENTERS. v. OSHKOSH FEEDYARD CORP.
Cite as 306 Neb. 775

limited liability corporation, Oshkosh Heifer Development, for purposes of negotiating an offer. All evidence presented at the summary judgment hearing was that the formation of Oshkosh Heifer Development was merely the first step in reaching an accord as to the terms of the conveyance that did not occur until December.

While it is true that Jessen was both a party to Oshkosh Heifer Development and the president of Oshkosh Feedyard, it would be mere speculation to infer that because of Jessen's dual roles, he had already reached an accord on behalf of Oshkosh Feedyard with Oshkosh Heifer Development and fabricated an arbitrary 3-month delay in selling Oshkosh Feedyard. As we said in *The Nebraskans, Inc. v. Homan*,[41] an agent's speculation that something between the buyers and sellers took place within the protection period does not create a material issue of fact.[42]

### (d) Conspiracy to Tortiously Interfere With Business Relationship

In its second cause of action, GCE alleged the defendants engaged in a conspiracy to tortiously interfere with GCE's contract, business relationship, or expectation. Specifically, GCE alleged that Betley, Braun, and Matzke "conspired with [Jessen] to arrange terms of a sale which deprived [it] of the Brokerage Fee owed . . . under the Exclusive Listing Agreement." Under this theory, GCE again alleged that while it did not earn a commission under the exclusive listing agreement by producing a ready, willing, and able buyer within the listing period (or a sale within the protection period), this failure was proximately caused by the alleged conspiracy between the defendants.

---

[41] *The Nebraskans, Inc. v. Homan*, 206 Neb. 749, 294 N.W.2d 879 (1980).

[42] See, *Lange Indus. v. Hallam Grain Co., supra* note 38; *Sack Bros. v. Tri-Valley Co-op, supra* note 38; *Bedore v. Ranch Oil Co., supra* note 40.

- 813 -

Nebraska Supreme Court Advance Sheets
306 Nebraska Reports
GEORGE CLIFT ENTERS. v. OSHKOSH FEEDYARD CORP.
Cite as 306 Neb. 775

[20-24] A civil conspiracy is a combination of two or more persons to accomplish by concerted action an unlawful or oppressive object, or a lawful object by unlawful or oppressive means.[43] A claim of civil conspiracy requires the plaintiff to establish that the defendants had an expressed or implied agreement to commit an unlawful or oppressive act that constitutes a tort against the plaintiff.[44] The gist of a civil conspiracy action is not the conspiracy charged, but the damages the plaintiff claims to have suffered due to the wrongful acts of the defendants.[45] Furthermore, a civil conspiracy is actionable only if the alleged conspirators actually committed some underlying misconduct.[46] That is, a conspiracy is not a separate and independent tort in itself; rather, it depends upon the existence of an underlying tort.[47] So without such underlying tort, there can be no cause of action for a conspiracy to commit the tort.[48]

[25,26] To succeed on a claim for tortious interference with a business relationship or expectancy, a plaintiff must prove (1) the existence of a valid business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an unjustified intentional act of interference on the part of the interferer, (4) proof that the interference caused the harm sustained, and (5) damage to the party whose relationship or expectancy was disrupted.[49] One of the basic elements of tortious interference with a business relationship requires an

---

[43] *deNourie & Yost Homes v. Frost*, 289 Neb. 136, 854 N.W.2d 298 (2014).

[44] *Id.*

[45] *Id.*

[46] See *id.*

[47] *Id.*

[48] *Id.*

[49] *Denali Real Estate v. Denali Custom Builders*, 302 Neb. 984, 926 N.W.2d 610 (2019).

- 814 -

Nebraska Supreme Court Advance Sheets
306 Nebraska Reports
GEORGE CLIFT ENTERS. v. OSHKOSH FEEDYARD CORP.
Cite as 306 Neb. 775

intentional act that induces or causes a breach or termination of the relationship or expectancy.[50]

[27] Though never explicitly pled or argued, the apparent underlying breach at issue (besides the provision of the protection period already discussed) is that of the implied covenant of good faith. Real estate broker agreements, like other contracts, contain an implied covenant of good faith pursuant to which the seller impliedly covenants he or she will do nothing that will have the effect of destroying or injuring the right of the broker to earn a commission.[51] In *Dworak v. Michals*,[52] for example, we held that the real estate agent was entitled to a commission for having procured buyers ready, able, and willing to buy on the seller's terms but who backed out of the agreement when they learned of misrepresentations by the seller. Similarly, in *Dunn v. Snell*,[53] we held that while the principal had a right under the agreement to revoke the agency at any time before a sale, where the revocation was in bad faith, it did not defeat a broker's right to compensation for the postrevocation completion of a sale on the same terms originally proposed by the agent before revocation but rejected by the buyer.

All the defendants averred that they never had any conversations with Jessen about delaying the purchase or trying to deprive GCE of a commission. They further averred that they lacked any intent to delay reaching an agreement. Betley, Braun, and Matzke were not even aware of the exclusive listing agreement until late June 2014, and, as discussed, it was undisputed that they negotiated with Jessen with Bretz' encouragement. There was simply no evidence that could support a reasonable inference that the defendants all agreed to

---

[50] *Id.*

[51] *Kislak Co., Inc. v. Geldzahler*, 210 N.J. Super. 255, 509 A.2d 320 (1985).

[52] *Dworak v. Michals, supra* note 20.

[53] *Dunn v. Snell*, 124 Neb. 560, 247 N.W. 428 (1933). See, also, *Maddox v. Harding*, 91 Neb. 292, 135 N.W. 1019 (1912).

- 815 -

Nebraska Supreme Court Advance Sheets
306 Nebraska Reports
GEORGE CLIFT ENTERS. v. OSHKOSH FEEDYARD CORP.
Cite as 306 Neb. 775

intentionally interfere with GCE's business relationship with Oshkosh Feedyard or otherwise assist in any bad faith act.

Nor, as discussed with regard to the first cause of action, was there any evidence from which GCE could establish proximate causation of any damages deriving from the alleged conspiracy. In other words, there was no evidence from which it could reasonably be inferred that but for the alleged conspiracy to deprive GCE of a commission, Betley, Braun, and Matzke would have either made an offer at the listing price or reached an agreement acceptable to Oshkosh Feedyard on the price and terms of a purchase, within either the listing period or the protection period.

### (e) Conclusion as to Frivolous Nature of Suit

[28] On appeal, we will uphold a lower court's decision allowing or disallowing attorney fees for frivolous or bad faith litigation in the absence of an abuse of discretion.[54] A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.[55]

Neb. Rev. Stat. § 25-824(2) (Reissue 2016) provides that the court shall award reasonable attorney fees and costs against any attorney or party who has brought or defended a civil action that alleged a claim or defense which a court determines is frivolous or made in bad faith. Section 25-824(4) provides that the court shall assess attorney fees and costs if, upon the motion of any party or the court itself, the court finds that an attorney or party brought or defended an action or any part of an action that was frivolous or that the action or any part of the action was interposed solely for delay or harassment. Section 25-824(5) clarifies that no attorney fees or costs shall

---

[54] *Korth v. Luther, supra* note 2.

[55] *Id.*

- 816 -

Nebraska Supreme Court Advance Sheets
306 Nebraska Reports
GEORGE CLIFT ENTERS. v. OSHKOSH FEEDYARD CORP.
Cite as 306 Neb. 775

be assessed if a claim or defense was asserted by an attorney or party in a good faith attempt to establish a new theory of law in this state or if, after filing suit, a voluntary dismissal is filed as to any claim or action within a reasonable time after the attorney or party filing the dismissal knew or reasonably should have known that he or she would not prevail on such claim or action.

[29-31] Frivolous for the purposes of § 25-824 is defined as being a legal position wholly without merit, that is, without rational argument based on law and evidence to support a litigant's position in the lawsuit.[56] It connotes an improper motive or legal position so wholly without merit as to be ridiculous.[57] The determination of whether a particular claim or defense is frivolous must depend upon the facts of the particular case.[58]

It was not clearly untenable for the district court to determine that GCE's pursuit of the first cause of action stated in its amended complaint was frivolous. As the court noted, GCE knew it had waived the provision of the protection period prohibiting direct negotiations with Oshkosh Feedyard before bringing this action and the 2014 action against Jessen and Oshkosh Feedyard. GCE's legal position that Jessen and Oshkosh Feedyard had breached the contract by failing to refer purchasers whom Bretz had actual knowledge of and by negotiating directly with those purchasers, when Bretz encouraged them to do so, was so wholly without merit as to be ridiculous.

But GCE's second cause of action, for conspiracy to interfere with business expectations, was not frivolous, and the district court abused its discretion in concluding otherwise. Unlike GCE's claim for breach of contract, for which it was

[56] *Id.*

[57] *Id.*

[58] See *Shanks v. Johnson Abstract & Title*, 225 Neb. 649, 407 N.W.2d 743 (1987).

- 817 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
306 NEBRASKA REPORTS
GEORGE CLIFT ENTERS. v. OSHKOSH FEEDYARD CORP.
Cite as 306 Neb. 775

aware of facts making the claim wholly without merit from its inception, GCE's claim for conspiracy to interfere with business expectations was cognizable and brought with a reasonable belief that discovery would support its allegations.

We recognize that § 25-824(5) contemplates that attorney fees may be assessed when a party persists in asserting a claim after it knows or reasonably should know it would not prevail on the claim. But while we find that the district court did not abuse its discretion in denying GCE's motion for a continuance in order to take depositions, it does not follow that GCE's continuing pursuit of its second cause of action was unreasonable. Any doubt about whether a legal position is frivolous or taken in bad faith should be resolved in favor of the one whose legal position is in question.[59] The record supports GCE's contention that it persisted in asserting the conspiracy claim reasonably believing it was entitled to a continuance of the summary judgment hearing in order to take depositions that it reasonably believed could reveal evidence to support its second cause of action. Accordingly, the district court abused its discretion by concluding that GCE pursued its second cause of action after it reasonably should have known it would not prevail and in awarding attorney fees to Betley, Braun, Matzke, and Oshkosh Heifer Development on that basis.

To the extent that the district court awarded attorney fees to all the defendants based on their defense of both causes of action since the inception of this lawsuit in 2017, it abused its discretion. Attorney fees for Jessen and Oshkosh Feedyard related to the first cause of action should be limited to the fees incurred in defending that cause of action. No attorney fees should be awarded in relation to the second cause of action.

Thus, the court erred in awarding any attorney fees to Betley, Braun, Matzke, and Oshkosh Heifer Development—defendants solely to the second cause of action. We reverse the order of

---

[59] *TFF, Inc. v. SID No. 59*, 280 Neb. 767, 790 N.W.2d 427 (2010).

- 818 -

Nebraska Supreme Court Advance Sheets
306 Nebraska Reports
GEORGE CLIFT ENTERS. v. OSHKOSH FEEDYARD CORP.
Cite as 306 Neb. 775

attorney fees and remand the cause with directions for the court to redetermine the amount of attorney fees to be awarded to Jessen and Oshkosh Feedyard in relation to their defense of the first cause of action.

### 3. Cross-Appeal

On cross-appeal, Jessen and Oshkosh Feedyard assign and argue that the district court erred by not sustaining their motion to disqualify GCE's counsel and by failing to make the award of attorney fees joint and several against GCE's attorneys.

[32,33] We find that Jessen and Oshkosh Feedyard's assignment of error regarding the denial of their motion to disqualify GCE's counsel is moot. Mootness refers to events occurring after the filing of a suit, which eradicate the requisite personal interest in the resolution of the dispute that existed at the beginning of the litigation.[60] An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it.[61] Jessen and Oshkosh Feedyard prevailed in their summary judgment motion against GCE despite the alleged conflict of interest of GCE's counsel. They take pains to point out in appealing the denial of their motion to disqualify GCE's counsel that they do not wish to relitigate this underlying result. They simply argue that the same counsel should be disqualified for similar reasons in the action against Jessen for self-dealing. Jessen, sued in his individual capacity in the self-dealing action, is free to move to disqualify plaintiffs' counsel in that case if he believes he has standing and grounds for such a motion.

[34] We find no merit to Jessen and Oshkosh Feedyard's assertion that the district court abused its discretion by failing to order that GCE's attorneys have joint and several liability with GCE for the award of attorney fees pursuant to § 25-824.

---

[60] *Bramble v. Bramble*, 303 Neb. 380, 929 N.W.2d 484 (2019).

[61] *Weatherly v. Cochran*, 301 Neb. 426, 918 N.W.2d 868 (2018).

- 819 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
306 NEBRASKA REPORTS
GEORGE CLIFT ENTERS. v. OSHKOSH FEEDYARD CORP.
Cite as 306 Neb. 775

Under § 25-824, "[w]hen a court determines reasonable attorney's fees or costs should be assessed, it shall allocate the payment of such fees or costs among the offending attorneys and parties as it determines most just and may charge such amount or portion thereof to any offending attorney or party." Allocation of amounts due between offending parties and attorneys is "'part and parcel'" of the determination of the amount of the award and is reviewed for an abuse of discretion.[62] GCE was clearly the driving force of its 5-year fruitless pursuit of a commission for the sale of Oshkosh Feedyard. Further, the defendants never presented an argument to the district court as to why GCE's attorneys should be held jointly and severally responsible for GCE's continuing pursuit of the frivolous action. Under these facts, the district court's judgment assessing costs and fees solely against GCE was not clearly untenable.

## VI. CONCLUSION

For the foregoing reasons, we affirm the order of the district court granting summary judgment. We reverse the district court's award of attorney fees and remand the cause with directions to reassess the amount of the award of attorney fees to Jessen and Oshkosh Feedyard in accordance with this opinion.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.

---

[62] See *Cedars Corp. v. Sun Valley Dev. Co.*, 253 Neb. 999, 1006, 573 N.W.2d 467, 472 (1998).